# MOSES v. UNITED STATES.

ERROR TO THE COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA.

No. 185. Argued March 24, 25, 1897. — Decided April 19, 1897.

A bond to the United States, conditioned that a property and disbursing officer of the War Department shall faithfully discharge his duties, and faithfully account for public money and property committed to his charge, takes effect on the day when it is accepted by the Government, and is to be regarded as of that date.

When it appears that such a bond, duly signed by sureties, had been offered to the government official, and rejected by him as not bearing seals, and that it was taken away by the property and disbursing officer, the principal, and returned with proper seals, it will be presumed, in the absence of proof to the contrary, that the seals were attached with the consent of the sureties.

The order of the Secretary of War directing the execution of such a bond was one which he had power to make, and, being made, the disbursing officer was bound to have it executed and filed.

The Chief Signal Officer had the right to designate one of the officers under him as a property and disbursing officer to whom should belong the custody of all government property and funds pertaining to the office of the Chief Signal Officer, and he further had the power, under the general direction of the Secretary of War, to provide that such officer should be responsible for the due execution of his official duties ; and, a bond having been given for such faithful performance, and such officer having been guilty of the forgery of vouchers and the embezzling of public moneys officially received by him, such conduct was a plain violation of his duty as such officer, and the condition of the bond, as it plainly covered such conduct, was violated thereby.

A certificate given to such disbursing officer before the discovery of his fraud that his accounts had been examined; found correct and were closed, did not operate to release him or his sureties from liability on the bond.

There was no delay in the commencement of the proceedings against the disbursing officer, which injured the sureties, or operated to release the latter from their liability under the bond.

The transcripts from the books and proceedings of the Treasury Department

were admissible in evidence as sufficient transcripts within Rev. Stat. § 886, and the certificate which certified that the papers annexed thereto were true copies of the originals on file, and of the whole of such originals, was a full compliance with the law.

Under circumstances like those disclosed in this case the account between the Government and its officer may be restated, and the sums allowed him on fraudulent vouchers disallowed.

The judgment recovered against the officer was admissible in evidence in an 'action against the surety on his bond, although the latter was no party to it.

ON the 7th day of December, 1880, First Lieutenant H. W. Howgate, Acting Signal Officer, U. S. Army, sent in his resignation to the Adjutant General, at Washington, through the Acting Chief Signal Officer. At that time there was in existence paragraph 2394, United States Army Regulations, which provided that "An officer retiring from service shall before final payment produce certificates from the several accounting officers of non-indebtedness to the United States, and make an affidavit upon the final voucher, stating in addition the correctness of its several items, the place of his residence, and that he is not indebted to the United States on any account whatever." These certificates were obtained by Lieutenant Howgate, and his resignation was accepted by the President to take effect December 18, 1880. On the 27th of April, 1881, a final payment was made to him of $104, being the balance due him for salary, etc., and his accounts as then appearing on the books of the Government stood balanced. Soon after the date of this final payment it became evident, from examinations made in the books of the Government and by investigations from other sources, that Lieutenant Howgate had perpetrated gross frauds upon the Government by means of fraudulent and forged vouchers, which had been accepted by the Government as genuine, and upon which his certificates for settlements had been made. Upon a restatement being had, in which these false and fraudulent vouchers were omitted from the credits which had been thereby given to him, it appeared that he was a defaulter in the sum of over $133,000. On the 24th of August, 1881, an action was commenced by the Government against him to recover over one hundred

thousand dollars, being the amount of moneys unlawfully drawn on, and obtained by him from the United States Treasury, a list of which was set forth in the "particulars of demand" accompanying the declaration.

Upon affidavits setting up certain facts showing the false and forged character of the. vouchers an attachment was issued in the action, and certain property of his was attached.

The defendant appeared by attorney, and finally on the 24th day of May, 1883, upon motion of the district attorney, judgment in favor of the United States against the defendant for want of a plea was granted, and judgment entered in favor of the plaintiff against the defendant for $101,257.08, with interest thereon from August 24, 1881.

By virtue of this judgment the property which had been seized by virtue of the attachment issued in the action was sold, and the sum of $28,000 was realized upon such sale, and the amount thereof credited upon the judgment.

This present action was commenced on the 29th of September, 1884, on a bond alleged to have been executed by the defendants named in the action, being Henry W. Howgate, William B. Moses and Lebbeus H. Rogers. Of these defendants Mr. Moses was the only one served with process.

The original declaration contained but one count, and alleged that the defendants "on the 2d day of April, in the year of our Lord one thousand eight hundred and seventy-eight, at the district aforesaid, by their certain writing obligatory, of that date, sealed with their seals, and now here in court produced, jointly and severally bound and acknowledged themselves to be indebted to the plaintiff in the sum of twelve thousand dollars, to be paid to plaintiff on demand, yet though requested, the said defendants have never paid the same to plaintiff, but have wholly neglected and refused, and still do neglect and refuse, so to do." Judgment for the sum was then demanded.

The bond sued on was introduced in evidence upon the trial, and reads as follows:

"Know all men by these presents, that we, Henry W. Howgate, 1st lieut. 20th U. S. Infantry, William B. Moses,

Washington, D. C., and Lebbeus H. Rogers, New York City, New York, are held and firmly bound unto the United States of America in the sum of ($12,000) twelve thousand dollars, lawful money of the United States, to be paid to the United States; for which payment well and truly to be made, we bind ourselves and each of us, our and each of our heirs, executors and administrators, for and in the whole, jointly and severally, firmly by these presents.

"Sealed with our seals. Dated the — day of March, in the year of our Lord one thousand eight hundred and seventy-eight, and of the independence of said States the one hundred and second.

"The condition of this obligation is such that whereas the above-bounden First Lieut. Henry W. Howgate, 20th Inf't'y, has been assigned to duty as a property and disbursing officer, Signal Service, U. S. A., ——— has accepted said assignment:

"Now, if the said 1st Lieut. Henry W. Howgate, 20th Infantry, shall and doth at all times henceforth and during his holding and remaining in said office carefully discharge the duties thereof and faithfully expend all public money and honestly account for the same and for all public property which shall or may come into his hands on account of Signal Service, U. S. Army, without fraud or delay, then the above obligation to be void; otherwise to remain in full force and virtue.

<blockquote>
"HENRY W. HOWGATE.　[SEAL.]<br>
LEBBEUS H. ROGERS.　[SEAL.]<br>
W. B. MOSES.　[SEAL.]
</blockquote>

"Signed and delivered in presence of —
　"JAMES A. SWIFT,
　ANSON MALTBY,
　　*Witnesses as to Lebbeus H. Rogers.*
　JAMES A. SWIFT,
　　*Witness as to W. B. Moses.*"

The bond contained also the justification of Mr. Rogers, as surety, and purported to have been sworn to in the city of

New York on the 13th day of March, 1878. It also contained the justification of Mr. Moses, as surety, and purported to have been sworn to by him on the 14th day of March, 1878, at Washington, D. C. The bond also contained the indorsement of Chief Justice Cartter of the Supreme Court of the District of Columbia, certifying that satisfactory evidence of the sufficiency of the sureties to the bond had been given and that he approved the same.

A second count to this declaration was subsequently added, in which the appointment of the defendant Howgate to the Signal Office at Washington, his assignment to duty there as property and disbursing officer, the execution of the bond bearing date the — day of March, 1878, its delivery and the condition contained in such bond, the receipt of a large amount of public moneys, and the failure to expend and honestly account for the sum of one hundred and thirty-three thousand and odd dollars, were all set forth at length and in detail.

The defendant Moses filed several pleas, setting forth substantially the defences: (1) that the alleged writing was not his bond; (2) that it was extorted from Howgate without any authority of law; (3) that there was no such office created by law as was mentioned in the bond, and no duties pertaining to the office prescribed by law or by any regulation or order of any department or officer, and that the alleged bond was void for uncertainty; (4) that the accounting officer of the Treasury had duly settled the accounts of Howgate and issued to him a certificate of non-indebtedness to the United States, of which the defendant Moses had notice, which discharged him from liability as surety on the bond; (5) that Howgate had kept and performed the condition of the bond.

Prior to the trial and on the 2d of May, 1892, Moses died, and the suit was continued against his administrators. The trial commenced on the 22d of March, 1893. To maintain its case the Government gave evidence as to the organization of the Signal Service. It then offered in evidence a duly certified copy of the order, dated April 18, 1868, from the Adjutant General's Office, directing Lieutenant Howgate to report

for duty to the Chief Signal Officer of the Army. Also a duly certified copy of the order from the office of the Chief Signal Officer of the Army, dated Washington, July 25, 1876, stating that "First Lieutenant H. W. Howgate, 20th Infantry, Brevet Captain, U. S. A., Acting Signal Officer's assistant, is hereby assigned to duty ' as property and disbursing officer' at this office, together with such other duties as may be assigned to him." Also copy of a letter of Howgate's, dated Washington, March 26, 1878, addressed to the Secretary of War, in which he said: "In compliance with what I understand to be the wishes of the department, I have the honor to enclose herewith a bond similar in amount and form to that given by a captain of the commissary department."

It appears from the record that this bond was referred by the War Department on the 27th of March, 1878, to the Judge Advocate General for an opinion as to its sufficiency and form; that on the same day it was returned to the Secretary of War by the Judge Advocate General, with a communication that the bond was in due form, "except in that it wants the formal seals required to be affixed to the signatures of the obligor and sureties, by standing order of the War Department of June 11, 1869." Whereupon on the 29th of March, 1878, the bond was returned to Lieutenant Howgate, by order of the Secretary of War, "to have the proper seals affixed." On the 1st of April, 1878, the bond was returned to the War Department, accompanied by a written communication, signed by Lieutenant Howgate, in which he said that the bond was "respectfully returned to the Honorable Secretary of War with seals affixed as per instructions." Thereupon, and on the 2d day of April, 1878, the bond was approved. The Government then called the subscribing witness to the bond as to Howgate and Moses. The witness proved their signatures, and that they executed the bond at the Signal Office in Washington, March 14, 1878. The witness thought, though he was not positive, the seals were then on the bond. (In this he must have been mistaken, as the above statement substantially proves the contrary.) The bond was then offered and received in evidence under defend-

ants' objections. The Government then proceeded to give evidence to show the breach of the condition of the bond by producing transcripts of books and proceedings of the Treasury Department, which it claimed were properly certified under section 886 of the Revised Statutes of the United States, and by producing witnesses upon the question of the forgery of the vouchers by Howgate.

Various other questions arose upon the trial in regard to requests to charge which are sufficiently referred to in the opinion.

The jury found a verdict for $12,000 with interest from September 29, 1884, and the defendants, the administrators, having filed an admission of sufficient assets when administered to satisfy the recovery, judgment was, on the 1st day of April, 1893, entered upon the verdict.

The defendants' motion for a new trial, for errors in law and upon exceptions taken, was denied, and upon appeal to the Court of Appeals the judgment was affirmed, and the defendants now seek a review of that judgment by this court.

*Mr. William F. Mattingly* and *Mr. W. L. Cole* for plaintiffs in error.

*Mr. Solicitor General* for defendants in error. *Mr. Andrew B. Duvall* filed a brief for same.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

Various errors are assigned in this court, the first two of which allege that error was committed: First, in admitting the alleged bond in evidence, there being a material variance in date between the instrument offered and the one described in the declaration; Second, in admitting the alleged bond in evidence when there was no evidence tending to prove that it was sealed by W. B. Moses.

(1). We think there was no material variance as claimed by the defendants. The first count in the declaration states the date of the bond as the 2d of April, 1878. The bond as offered in evidence is dated the — day of March, 1878. In

the second count of the declaration, the bond sued on was alleged to have been dated the — day of March, 1878. The bond was offered in evidence, while that count stood, and as it showed no variance when compared with the second count, the defendants' counsel said that they were justified in making no objection to its admission at that time on that ground. When in the course of the trial the second count was withdrawn, by leave of the court, it left but the original first count in the declaration, and, thereupon, the defendants moved to strike out the bond that had been admitted in evidence, upon the ground that the bond declared upon in the first count of the declaration is described as a bond bearing date on the 2d day of April, 1878, and the bond which was theretofore offered in evidence by counsel for complainant purports to bear date on the — day of March, 1878. The motion was overruled, and defendants' counsel excepted, and it is that exception upon which defendants' counsel now claim a reversal of the judgment.

It is seen by reference to the foregoing statement of facts that the bond was finally sent back by Howgate to the Secretary of War, with seals attached, in a letter dated April 1, 1878, and that it was approved, that is, accepted, April 2, 1878. It is settled that a bond of that character takes effect on the date of acceptance, and it is from that time that it speaks. *United States* v. *Le Baron*, 19 How. 73; same case, on another review, 4 Wall. 642, 647.

There is no claim made that there ever was any other bond than the one put in evidence, nor that the defendants were surprised or in any way misled by the difference in the date of the bond from the date alleged in the declaration. The objection is one of the most extreme technicality, and does not in any way reach the merits of the case.

The case of *Cooke* v. *Graham's Administrator*, 3 Cranch, 229, is cited by the defendants' counsel as authority for the claim that this variance is fatal. The question there arose upon a demurrer, and the decision is based upon the old and highly technical rules of pleading. Marshall, Chief Justice, said that the plaintiff having declared upon a bond, dated the

3d of October, and oyer being prayed, the bond appeared to bear date of the 3d of January preceding. By the oyer the bond was made a part of the declaration. He said there were several pleadings, and among the rest a bad declaration, a bad rejoinder, and a special demurrer by the plaintiff to this bad rejoinder. He then said the variance between the date of the bond declared upon and that of the oyer is fatal. But the principle of that case has nothing to do with that involved in the case at bar. The question here does not arise on demurrer, but in the course of a trial upon the merits. The bond having been declared upon as dated the 2d of April, 1878, is produced, and is shown to bear date the — day of March, 1878. Otherwise it is the same bond in description as that declared on, with no claim of there being any other bond, and with the proof that the bond in question, although dated on the — day of March was not accepted by the War Department until the 2d day of April, 1878, at which time it became a completed instrument, and from which time it took effect. It is plain to be seen that no possible harm or injury could occur to the defendants from disregarding this variance.

In *Nash* v. *Towne*, 5 Wall. 689, 698, Mr. Justice Clifford, in delivering the opinion of the court upon a question of variance, said: "Formerly the rule in that respect was applied with great strictness, but the modern decisions are more liberal and reasonable. Decided cases may be found, unquestionably, where it has been held that very slight differences were sufficient to constitute a fatal variance. Just demands were often defeated by such rulings until Parliament interfered, in the parent country, to prevent such flagrant injustice. Federal courts have possessed the power from their organization to the present time to amend such imperfections in the pleadings, except in cases of special demurrer set down for hearing, and are directed to give judgment according to law and the right of the cause. Recent statutes in the States also confer a liberal discretion upon courts in allowing amendments to pleadings, and those statutes, together with the change they have superinduced in the course of judicial decision, may be said to have established the general rule in the state tribunals that

no variance between the allegations of a pleading and the proofs offered to sustain it shall be deemed material, unless it be of a character to mislead the opposite party in maintaining his action or defence on the merits. Irrespective of those statutes, however, no variance ought ever to be regarded as material where the allegation and proof substantially correspond." We think this exception is without merit.

(2). We are also of opinion that there was no error in admitting the bond in evidence, under the objection that at the time it was admitted there was no evidence tending to prove that it was sealed by Mr. Moses. Passing the objection raised by the defendants in error as to the form of pleadings, and, referring to the foregoing statement of facts, it appears that at the time the bond was first tendered to the War Department it had been signed and acknowledged by the principal and his sureties, and the latter had each made an affidavit justifying as to his financial ability to become such surety, and that Howgate had presented the bond (without seals) to the Secretary of War, as in compliance with the directions of the War Department.

The instrument being incomplete when first sent to the department, there was no acceptance of the same at that time. Its return by the department with the objection stated did not in any sense make Howgate the agent of the Government to procure seals to the instrument; the Government undertook no such mission, and it was not under any obligation so to do. It stood indifferent whether Howgate procured those seals or not; he was under obligation to present a proper bond to the department, and if he did not do so, the department would take its own measures consequent upon that failure.

We have a case, therefore, where the proof is full as to the original signing of the bond by the sureties; no pretence of any forgery or any irregularity in that respect, the only defect being the lack of seals. This defect was pointed out by the officer of the Government, and Howgate took back the bond to have the seals put on, and in due time he returned it with the seals upon it. There is no direct evidence as to when or where the seals were put on or as to the actual consent of the

sureties. Under these circumstances, and with the proof in the condition thus stated, we think the presumption is with the Government, that the seals were placed upon the instrument with the consent of the parties, and if there were no such consent, that is matter of defence to be affirmatively established. The inference is very strong that consent was given. It has been held that proof of the execution of a bond, taken with the fact of possession by the proper party, was sufficient to found a presumption of proper delivery of the bond. *Edelin* v. *Sanders*, 8 Maryland, 118. In this case the evidence clearly forbids the supposition that the principal or the sureties contemplated a fraud upon the Government, or intended to present to it an incomplete instrument. The latter had already consented to act as sureties, had signed the paper, acknowledged their signatures, and justified as to their financial ability. The Government was asking no favor of them or of Howgate; it had simply declined to receive as a good bond the instrument they had executed for the very purpose of being accepted by the Government. No change of circumstances is shown between the original execution of the bond and its return with the seals attached to it by Howgate. The sureties were not in the position of having secured what they wanted by the execution of the instrument in the manner originally shown; nor was the Government in the attitude of asking something more of these sureties after they had secured the benefit for which the paper had been executed. As the matter stood, when the bond was returned to Howgate, he was under the same obligation to furnish a proper instrument that he had ever been, and for all that appears, precisely the same reasons for signing the instrument originally still existed with the sureties at the time when the seals were placed upon the bond. The evidence is strong enough upon which to base the presumption that under these circumstances the seals were placed upon the bond with the consent of the sureties, and the bond returned to the War Department properly executed. At least a *prima facie* presumption to this effect ought to be indulged in in cases such as this where bonds are furnished the Government

to secure the proper performance of duty by the obligors in such bonds. This principle we think is illustrated in the cases of *Dair* v. *United States*, 16 Wall. 1, and *Butler* v. *United States*, 21 Wall. 272.

When the officers of the Government received this bond for the second time, and the seals were then found upon it, there was nothing to attract their suspicion that the bond was not a proper instrument, executed in due form by all the obligors. The fact that it had once been presented without seals, and then when the objection was taken to that defect and the instrument returned to Howgate on that account, it was thereafter again sent in by Howgate, one of the obligors, with the seals affixed thereon, was not a circumstance of suspicion nor one to raise any doubt as to the consent of the other obligors to the placing of the seals upon the instrument signed by them. Being originally signed by them for the purpose of acceptance by the Government, there is no fact upon which a presumption could be based that they would refuse to make the instrument complete by adding their seals when it was found that they had been theretofore omitted.

The cases cited by counsel for the defendants do not impair the strength of this principle, nor do away with the presumption. Among the cases cited are *Follett's Heirs* v. *Rose*, 3 McLean, 332. The case involved but a question of fact, which was submitted to a jury, whether an instrument that was produced on the trial and had no seals attached to it, had had them attached when the instrument was originally executed many years prior thereto. *Edelin* v. *Sanders*, 8 Maryland, 118, 129, contains nothing inconsistent with the presumption that the seals in this case were affixed with the consent of the obligors.

In *State* v. *Humbird*, 54 Maryland, 327, the bond sued on had no seal opposite the name of one of the obligors, and there was no evidence that he had adopted the seal of any of the other parties to the instrument. It was held that the instrument was not his bond, because, in fact, there was no evidence of any seal belonging to him ever having been affixed, and no such seal was on the instrument when it was produced on the trial.

In *Chilton* v. *People*, 66 Illinois, 501, a *bond* was sued on, while the instrument produced had no seal. It was held that the fact that the instrument contained the statement "sealed with my seal," when there was no seal or scroll, did not supply the defect of its absence.

In *Barnet* v. *Abbott*, 53 Vermont, 120, the instrument when executed had no seal, but when delivered to the selectmen it was sealed. The evidence showed that the sureties did not affix the seals themselves, and in fact authorized no one to affix them to the instrument. The court held that it was defectively executed. (No evidence of this nature is to be found in the case at bar.)

In *United States* v. *Linn*, 15 Pet. 290, 311, the second and third counts of the declaration were upon "an instrument in writing." It was not averred that it was under seal. The instrument was executed under an act of Congress providing for the execution of a bond. The defendant demurred to the two counts and the question was certified to this court upon a certificate of a division of opinion: (1) as to whether the obligation set out in the declaration, being without seal, was a bond within the act of Congress; and (2) whether such instrument was good at common law. It was held that the instrument was not a bond within the act, but that it was good at common law. The case went down for further proceedings, during which a trial was had and the case came again before this court on writ of error, and it is reported in 1 How. 104. It seems that after the case went down the pleadings in the case were altered, and finally a plea was filed on the part of the defendants alleging merely that seals were affixed to the bond without the consent of the defendants, without alleging that it was done with the knowledge or by the authority or direction of the plaintiffs. It was held in the court below that the special demurrer to the plea was bad and the court gave judgment for the defendant, adjudging that the plea was sufficient in law. This court held otherwise, and it was upon the principle that the placing of the seals thereon after the execution of the instrument was a material alteration of it, but if done by a stranger and the instrument was valid without the seals and

was declared on as such an instrument, the action upon it could be maintained.

In *United States* v. *Nelson*, 2 Brock. 64, the parties to the bond were sureties, and signed in blank before the principal, but with full knowledge of the purpose for which the bond was to be executed. The blanks were afterwards filled up in their absence without express authority from them, and given to the officers of the United States, who accepted it. It was held by Marshall, Chief Justice, "with much doubt and with a strong belief that this judgment will be reversed," that the law is for defendants. Under the cases of *Dair*, 16 Wall. 1, and *Butler*, 21 Wall. 272, it would seem as if the doubts of the great Chief Justice were not entirely misplaced.

Not one of these cases lays down any principle which shows the ruling of the court below in this case to have been erroneous.

We come back, then, to a case where the proof was uncontradicted of a signing of an instrument, reciting that it was sealed (when in fact it was not) and that when sent to the obligee it was returned in order that seals might be affixed. It will, in the absence of evidence to the contrary, be presumed, when the bond is again presented with seals, that they had been inadvertently omitted, and that the sureties had consented to their being placed upon the instrument in order to make it effective, a purpose which they must have originally intended when they executed it. Any other presumption would tend to show that the sureties, when signing the instrument, intended an idle thing; that is, to sign a paper which would not answer the purpose for which it was then executed, or else they intended a fraud upon and to act dishonestly towards, the Government. Neither presumption should be indulged in. The presumption called for under the circumstances is the one which is based upon the view that the principal and the sureties intended to act honestly and to execute an instrument which would be accepted by the Government.

Upon the case as it stood there was no question to be submitted to the jury upon this bond. The presumption of a

final due execution arose from the evidence given on the part of the plaintiffs, and as none was given in explanation or in contradiction of it, the presumption was sufficient in law to base a finding of that fact thereon. We think that no sufficient objection in regard to the sealing of the bond was shown, and that this assignment of error is, therefore, not made good.

(3). Another objection to the validity of the bond is taken by the defendants, which is, that the bond was extorted *colore officii*, and is void for that reason. The defendants allege that there was no statute or regulation directing or permitting the exaction of a bond from an officer of the Army assigned to duty in the Signal Service at Washington and discharging the duties of "property and disbursing officer," and that, therefore, the bond exacted from Lieutenant Howgate was void. Defendants' counsel offered to prove that some time after he had been assigned to his position the Secretary of War, through his chief clerk, directed that Lieutenant Howgate, before receiving moneys upon requisitions made by him, should file a bond as particularly stated, and if he failed to file such bond that he should be relieved from duty as disbursing officer; that Lieutenant Howgate protested against this requirement for various reasons which he stated to the chief clerk, who informed him that the Secretary of War had made his decision upon the question involved after due deliberation, and had directed that unless he filed the required bond he should be relieved from duty as disbursing officer; that after receiving this information from the chief clerk, Lieutenant Howgate forwarded to the War Department the bond upon which this suit is brought. The evidence was rejected and exception taken by counsel for the defendant. It is now urged that such evidence was material; that it showed that the bond was improperly and illegally extorted from Lieutenant Howgate under fear of losing his position as property and disbursing officer, and that the bond is therefore void.

We think the evidence was properly excluded, although there was no statute specially providing for the execution of a bond by one occupying the position of Lieutenant Howgate.

The order of the War Department that a bond should be executed was one which the Secretary of War had power to make.

It was held in the case of *United States* v. *Tingey*, 5 Pet. 115, that the United States had a right to take a bond to insure the faithful performance of duty on the part of an individual or officer where such bond was voluntarily given, and was not in violation of any provision of law. The particular bond in that case was held void as being extorted under color of office because it was in plain violation of the statute in regard to giving such bond, and it was demanded of the party upon the peril of losing his office. The court said under those circumstances that the bond was an illegal instrument, "for no officer of the Government has a right, by color of his office, to require from any subordinate officer, as a condition of holding office, that he should execute a bond with a condition different from that prescribed by law." The court also said however: "That a voluntary bond taken by authority of the proper officers of the Treasury Department, to whom the disbursement of the public moneys is entrusted, to secure the fidelity in official duties of a receiver or an agent for disbursery of public moneys, is a binding contract between him and his sureties and the United States; although such bond may not be prescribed or required by any positive law. The right to take such a bond is in our view an incident to the duties belonging to such a department; and the United States having a political capacity to take it, we see no objection to its validity in a moral or a legal view." See also *United States* v. *Maurice*, 2 Brock. 96; *Jessup* v. *United States*, 106 U. S. 147, where the same views are set forth.

The consideration or the condition of the bond must not be in violation of law; it must not run counter to any statute; it must not be either *malum prohibitum* or *malum in se*. Otherwise and for all purposes of security, a bond may be valid though no statute directs its delivery.

We do not understand by the decision in Peters, above cited, that the meaning of the term "voluntary bond" is that the bond must have been offered and pressed upon the Government when never asked for or demanded by it. It is a voluntary

bond when it is not demanded by any particular statute or regulation based thereon, and when it is not exacted in violation of any law or valid regulation of a department. Having the right to take a bond, the Government in a case like this has the right to demand it from the officer, and to say to him that if he do not give it he will not be continued as a "property and disbursing officer of the Signal Service." Such a demand when complied with does not amount to the illegal exaction or extortion of the bond. The case of a bond so procured differs radically from a case like that of Tingey (*supra*), inasmuch as the bond in the latter case was extorted from a reluctant officer with a condition therein contained different from that which the statute called for.

The power of the Government to take bonds in cases of this nature in the absence of any law or general regulation to that effect, but by direction of the head of a department, was recognized again in the case of the *United States* v. *Bradley*, 10 Pet. 343, 359. In that case the bond taken contained conditions beyond those provided for in the act of Congress, yet it was held that those conditions which were within the act were valid and could not be regarded as extorted from the obligor, although they were set forth in the same instrument which contained other and illegal conditions. The case of Tingey (*supra*) was cited by the court and approved as to the principle that the United States may take a bond as security, etc., when not in violation of any statute.

In this case we think the bond was a voluntary bond in the sense that it was not illegally extorted from the defendant Howgate, under color of office or by threats from a superior officer; that the United States through the Secretary of War had the right to demand a bond with conditions such as the bond in question contains, and that it did not cease to be a voluntary bond merely because Lieutenant Howgate did not gratuitously and without request proffer it and ask that it might be received, or because he was reluctant to give it, and only gave it upon the demand of the Secretary. Under the facts developed in this case, situated as Lieutenant Howgate was with respect to the public moneys, the United States,

having the right to take a bond, had the right to demand
it under penalty of refusing to permit him to longer remain
as a disbursing officer or to further receive public moneys for
disbursement by him.   An action brought in the Southern
District of New York by the United States against Rogers,
one of the sureties on this same bond, was decided in favor
of the Government by the United States District Court,
*United States* v. *Rogers*, 28 Fed. Rep. 607, and that judg-
ment was affirmed by the United States Circuit Court in
the Southern District of New York.   *Rogers* v. *United States*,
32 Fed. Rep. 890.   On writ of error to this court the judg-
ment was affirmed, but not on any ground affecting the
merits.   Both the District and Circuit Courts held the bond
was good, and adjudged accordingly.

We are, in view of all the facts, of opinion that the refusal
to admit the evidence offered by defendants' counsel upon this
issue did not constitute any error on the part of the learned
trial court.

(4).   Another objection taken by the defendants is that this
bond is void for uncertainty, because there was no law creat-
ing any such position as that "of property and disbursing
officer of the Signal Service, U. S. A.," nor any law or army
regulation defining the duties of any such officer.

The Signal Service Corps as a branch of the Army was
known during the war.   After its close and as long ago as
1870, Congress, by a joint resolution approved on the 9th day
of February of that year, authorized the Secretary of War to
provide for the taking of meteorological observations at the
military stations and other points in the interior of the conti-
nent, and for giving notice on the northern lakes and seaboard
of the approach and course of storms.   On the 28th of Febru-
ary, 1870, the Secretary of War addressed a written com-
munication to Brigadier General Meyer, Chief Signal Officer
of the Army, in which, after embodying the joint resolution,
as above referred to, the Secretary of War continued: "In
view of this enactment, I have to inform you that you as Chief
Signal Officer of the Army are charged with the duties to arise
under the provisions of the same, subject to the direction of the

Secretary of War." On the 10th of June, 1872, one of the appropriation bills was approved, in which was an appropriation of $250,000 to provide materials and to pay for telegraphing the weather reports under the authority and regulations of the Secretary of War; and on the 27th of June, 1872, the War Department directed, in a written communication addressed to the Chief of the United States Signal Corps, that such officer and all persons who had been or should be thereafter designated and employed by him for the taking of meteorological observations, etc., were thereby recognized and appointed as agents of the War Department for those purposes. By the army appropriation act of 1874, 18 Stat. 72, it was enacted that the Signal Service should be maintained as then organized under the authority of the Secretary of War. Thereafter and on the 25th of July, 1876, Lieutenant Howgate, then acting Signal Officer and assistant at Washington, was duly assigned by the Chief Signal Officer to duty as "property and disbursing officer" at the Signal Office at Washington, with such other duties as might be assigned to him. Appropriations of a similar nature to that above-mentioned act for the signal service have been constantly made by Congress ever since.

The Revised Statutes also authorized, § 161, "The head of each department to prescribe regulations not inconsistent with law for the government of his department, the conduct of its officers and clerks, and distribution and performance of its business, and the custody and use and preservation of the records, papers and property pertaining to it." Section 1094 of the Revised Statutes recognized the existence of the Chief Signal Officer of the Army of the United States, and section 1195 gave to that officer the rank of colonel of cavalry, and directed that under the direction of the Secretary of War he should have charge of all signal duty and of all books, papers and apparatus connected therewith.

Upon this evidence we think it apparent that in the proper conduct of his office the Chief Signal Officer had the right to designate one of the officers detailed for service under him as a "property and disbursing officer," to whom should belong,

as provided for in the order of such chief, the custody of all government property and funds pertaining to the office of the Chief Signal Officer, and that such Chief Signal Officer had the power, under the general direction of the Secretary of War, to provide that the property and disbursing officer should be responsible for the due execution of his duties as such. The Secretary, among other ways, recognized and approved the appointment of Howgate as a disbursing officer by directing him to give a bond as such officer, and he thereby recognized, and, in effect, provided, that there should be such an office. Among the duties of such an office it is plain was that of receiving and disbursing those moneys which had been appropriated by Congress for the Signal Service, and which came to him by reason of his designation as the property and disbursing officer of that branch of the service at Washington. If all the duties of such officer were not clearly specified and defined by law or the regulations of the department in which he was serving, it was at least clearly apparent that the public moneys which he received he was bound to honestly disburse and to account for to the proper officers of the Government. As a security for the honest discharge of such duties the bond in question was given, and one of the conditions of the bond was that he should "faithfully expend all public moneys and honestly account for the same, and for all public property which shall or may come into his hands on account of the Signal Service of the United States Army without fraud or delay." When he was guilty of the forgery of vouchers and the embezzling of the public moneys received by him as said officer, there can be no doubt or uncertainty that such conduct was a plain violation of his duty as an officer, and that the condition of the bond certainly and plainly covered such conduct, and was violated thereby.

The principle decided in *United States* v. *Bradley*, 10 Pet. 343, that bonds and other deeds may be, and in many cases are, good in part and void for the residue, where the residue is founded in illegality but not *malum in se*, may be invoked in this case. The two conditions of the bond were, (1) that Lieutenant Howgate should carefully discharge the duties of

property and disbursing officer of the Signal Service; and (2) that he should faithfully expend all public moneys, and honestly account, etc., as already stated. The condition that he should carefully discharge the duties of the office might, perhaps, be regarded as somewhat vague, on account of the uncertainty as to what constituted all of those duties, but there is neither vagueness nor uncertainty in the other condition, above stated. If the first condition were to be held void for uncertainty, there is no valid reason for holding that the second condition is also void, although not at all uncertain. When the cause of action consists in a breach of that particular condition of the bond which is plain, definite and certain, there is no reason for denying a recovery because of the uncertainty of another condition which need not be referred to in order to sustain the action.

Counsel for defendants ask " what proof was there that it was the duty of Howgate, under a bond with a penalty of $12,000, to receive and disburse the enormous sums charged against him in the ' consolidated transcript,' aggregating the sum of $1,132,742.32, in the brief period of about two years? " The attention of the War Department had been called to the Signal Service Office at Washington by reason of a requisition for fifty thousand dollars, in February, 1878, to be paid to Lieutenant Howgate as disbursing officer of the Signal Service. The answer to such requisition given from the War Department, among other things, was that " requisitions for advances should be for a less amount than fifty thousand dollars, or should not exceed twenty-five thousand dollars at any one time." The acts of Congress making appropriations for the Signal Service also show that a large amount of public moneys would be disbursed in the course of each year through the office of the Chief Signal Officer of the Army. How much that sum would reach it was not necessary to know accurately. A bond exacted for the sum of $12,000 was very likely demanded in view of the fact that frequent settlements were customary between the officer and the Treasury Department, and that requisitions were not to be made for any enormous sum at any one time. With such checks

upon the receipt and disbursement of public moneys, it might well have been thought that the amount demanded was sufficient. Reference was also had in the letter from the War Department to the amount of the bond demanded of a commissary of subsistence, having the same rank, though in a different branch of the service, and also charged with the receipt and disbursement of large amounts of public moneys. A bond in the same penalty as that given by such an officer was evidently supposed to offer sufficient security for the Government. Although when the bond was executed it might not have been supposed that the officer would have such large sums to disburse, that fact forms no defence to an action on the bond, which was conditioned for the honest disbursement of the public moneys, whatever might be their amount.

So far as this cause of action is concerned, the bond is not void for uncertainty, and the exception of the defendants is unsustained.

(5). The defendants also claim the existence of error in the decision of the court below, that the settlement of Howgate's accounts was not a bar to the action. The evidence shows that his accounts had been regularly stated and passed by the accounting officers of the Treasury, and a certificate given him of non-indebtedness. These facts the defendants say were matters of record in the Treasury Department, and they urged that the plaintiff should therefore be estopped from maintaining this action.

To the same effect is the objection that the Government is estopped from maintaining this suit by the inequitable representations and conduct of their agents which misled the surety Moses, to his prejudice.

It is necessary to see what this alleged settlement was that is set up by the defendants as a bar to the maintenance of this action. It is seen by reference to paragraph 2394 of the army regulations, which is set forth in the statement of facts, that it was necessary to obtain certificates of non-indebtedness before an officer retiring from the service could obtain final payment of his salary. Immediately upon his resignation being offered, December 7, 1880, Lieutenant Howgate pro-

ceeded to obtain the necessary certificates. He procured from the Third Auditor of the Treasury Department various certificates under dates of October 1, December 10 and 23, 1880, January 6 and April 26, 1881. These certificates were for different quarters for the years 1879 and 1880, and certified that the auditor had examined and adjusted the account of H. W. Howgate, Lieutenant, 20th Infantry, A. S. O., and found the same balanced, " as appears from the statement and vouchers herewith transmitted for decision and certification."

The last certificate, signed by the Third Auditor, reads as follows :

" *Certificate of Non-indebtedness.*

" TREASURY DEPARTMENT,

" THIRD AUDITOR'S OFFICE, *April* 26, 1881.

"It is hereby certified that the accounts and returns of H. W. Howgate, Lt. 20th inf., late acting signal officer, U. S. A., have been examined, found correct and are closed.

"This certificate is granted to satisfy the pay department that the above-named officer is not indebted to the United States on the books of this office at the date hereof."

Certificates similar in their nature were obtained from the offices of the Chief of Engineers, the Quartermaster, the Ordnance Department, Second Auditor's Office, the Paymaster's and the Commissary General's Departments. Each certified substantially that Howgate " was not charged on the books of that office as a debtor to the United States," or " that his returns had been received, examined and found correct," or " that there were no charges remaining against him on the books of the office."

There is no proof that any one of these certificates was ever seen by the sureties or was known by them to exist, nor is there evidence that a settlement of any nature had ever been made between the principal and his sureties based upon or by reason of the certificates, nor that the condition of the sureties had been at all changed because of the existence of the certificates or any one of them. The certificates were, of course, based only upon what appeared after an examination

of the books in each department. Undoubtedly they were *prima facie* evidence of the facts they certified to, and in the absence of any evidence of mistake or of fraud attacking the integrity of the items, or any of them, appearing on the books and upon which the certificates were based, they would be conclusive in favor of the officer in any action against him. *Soule* v. *United States*, 100 U. S. 8, 11; *United States* v. *Bell*, 111 U. S. 477; *Ex parte Randolph*, 2 Brock. 447, 475; *United States* v. *Eckford*, 1 How. 250, 263; *United States* v. *Hunt*, 105 U. S. 183, 187. They would not, however, be conclusive as against evidence of the forgery of any vouchers upon which the accounts had been founded and the settlement arrived at; this is too plain for argument.

It is urged, however, that even if the certificates and books upon which they were based would ordinarily be open to explanation and would not be regarded by the courts as conclusive, the rule is nevertheless changed in this case by the action of the officers of the Government, by reason of which the Government is estopped from showing the falsity of the certificates and the forgery of the vouchers. The Government is charged with laches in failing to take proper means of enforcing its demands against Howgate, and in failing to promptly notify the sureties of the fact of his defalcation and of their liability to respond on that account to the extent of the penalty of the bond.

As late as April 26, 1881, the Government was ignorant of any cause of suspicion against Lieutenant Howgate, for on that date the Third Auditor of the Treasury Department certified to the correctness of Howgate's accounts and returns. Between that time and the 24th of August, 1881, the suspicions of the officers of the Government were aroused, an examination of the books was made, other investigations were entered upon, and the facts of the defalcation discovered, and on the last-named day a suit was commenced against Howgate for the purpose of recovering the sum of $101,257.08. The "particulars of demand," accompanying the declaration, showed that the suit was commenced to recover money unlawfully drawn and obtained by Howgate from the Treasury of the United States

on checks drawn by him on the Treasurer for the amount stated, aggregating the amount sued for in the action. The defendant appeared in the action by attorney, and finally judgment for want of an answer was entered on the 24th of May, 1883, and $28,000, subsequently realized on the sale of the defendant's property, was credited on the judgment.

The suit had been commenced in the Supreme Court of the District of Columbia, and Howgate, the defendant, and Moses, one of the sureties on his bond, were residents of the city of Washington in that District, and had been for many years. It is impossible to suppose that the fact of the alleged defalcation of Howgate was unknown to Moses. The record shows that a personal service upon Howgate was not obtained for the commencement of the action against him, which would imply an inability to discover him within the District or else his absence therefrom. The affidavit used upon obtaining the attachment showed that Howgate was aware of the investigation going on in relation to his accounts, and that with such knowledge he suddenly, and without declaring any other business or reason for leaving, left the District without indicating how long he would remain or when, if ever, he would return. The presumption is very strong from all these circumstances that Moses, after Howgate's departure from Washington, knew of the alleged defalcation and of the suit brought by the Government against Howgate. There can be no well-founded claim that such suit was not commenced promptly and there is no evidence that it was not prosecuted with due diligence, even though no answer had been put in up to the time when the judgment was taken. Various reasons might have existed for the delay between the commencement of the action and the entry of judgment, which cannot be said to have been unusual. There is nothing in the fact that the Government sued Howgate alone, without calling upon the sureties in the bond which would operate to the injury of the sureties. And there is no evidence that the sureties suffered any damage by reason of any action or lack of action on the part of the Government.

As to the certificates of non-indebtedness, there is no legal

presumption that the sureties had any knowledge that these certificates had ever been given to Howgate either at the time of or soon after his resignation, or at all. The case of *United States* v. *Alexander,* 110 U. S. 325, does not hold that there is any such presumption. In that case the Secretary of the Treasury having abated taxes against the defendant, under an act of Congress, the Commissioner of Internal Revenue gave notice of the fact to the principals in the bond, who then gave the same notice to their sureties, and the case was not decided on the ground of any presumption of knowledge on the part of the sureties as to the abatement.

We have looked at the cases cited by the counsel for the defendants upon this branch of the case. They all show either the giving of notice to the sureties of payment of the debt for which they were originally liable, or an admission of payment of the debt by the holder thereof, or a declaration of the holder of the security that he would exonerate the surety, or else a reliance by the sureties upon some conduct of the holder of the security towards them, and a necessary injury to them if the holder should be permitted to subsequently assume a different attitude. The cases referred to are placed in the margin.[1]

The case here is entirely barren of evidence that the sureties had knowledge of any fact going towards their exoneration, or that they acted or failed to act in any particular with reference to their principal by reason of the conduct of the government officials or the existence of the certificates mentioned. We are of opinion also that no such exonerating fact existed.

We are, therefore, unable to find either in the certificates alluded to or in the action of the officials connected with the Government anything precluding the inquiry as to the actual and true state of the accounts upon which the judgment in

---

[1] *United States* v. *Alexander,* 110 U. S. 325; *Harris* v. *Brooks,* 21 Pick. 195; *Carpenter* v. *King,* 9 Met. 511; *Baker* v. *Briggs,* 8 Pick. 121; *Taylor* v. *Lōhman,* 74 Indiana, 418; *Thornburgh* v. *Madren,* 33 Iowa, 380; *Chambers* v. *Cochran,* 18 Iowa, 159; *Gordon* v. *McCarty,* 3 Wharton, 407; *Brooking* v. *Farmers' Bank,* 83 Kentucky, 431; *Aaron* v. *Mendel,* 78 Kentucky, 427; 1 Greenl. Ev. § 207.

this case rests. The exception of the defendants upon this ground cannot prevail.

(6). The defendants also took exception to the decision of the court below in permitting plaintiff to introduce certain transcripts of the books and proceedings of the Treasury Department for the purpose of proving the actual state of the accounts between the Government and Howgate. These transcripts were objected to on two grounds: (1) that they showed on their face that they were mere statements of balances and not the entire account between the parties; (2) that they showed that the government officers had made a restatement of Howgate's account after he ceased to be property and disbursing officer, and that there was no authority for making such restatement, and that it was not evidence against the defendants. We think that neither objection is well founded.

The transcripts were received under section 886 of the Revised Statutes of the United States, and were certified to under the hand of the Secretary of the Treasury and the seal of the Treasury Department, on the 19th of November, 1884. There was also a certificate from the Third Auditor of the Treasury Department attached to the papers and certifying that they were transcripts from the books and proceedings of the Treasury Department, and that the papers annexed thereto were true copies of the originals on file and of the whole of said originals. Then followed a copy of the bond, and then another certificate from the Third Auditor that he had "examined and adjusted the account of H. W. Howgate, Lieutenant, 20th Infantry, property and disbursing officer, Signal Service, U. S. Army, from April, 1878, to September, 1880, and found the balance as follows " (giving the balance for each fiscal year for the years 1879, 1880 and 1881, and resulting in a balance due the United States of $133,255.22). This last certificate thus made by the Third Auditor does not purport to certify to a copy of the whole account between the Government and Howgate. The account which first follows the certificate is termed a "consolidated settlement," and is simply a summary of the amount, giving only the total amount due the United States for each of the fiscal years stated. It does not purport

to be the full account between the parties. Following that summary or "consolidated account," however, are the transcripts from the books of the Treasury Department, containing the account of Howgate, "property and disbursing officer, Signal Service of the United States, with the United States," including items of credits and of disbursements. In other words, both sides of the account are given in these transcripts and also the items of difference; that is, those items of credit which had been originally claimed by and allowed to Howgate, but which were subsequently disallowed by the accounting officers of the Government on a restatement of the account, were given in full. This restatement had been made in 1884, on the ground that many of the vouchers for items that had been formerly allowed Howgate were forged or otherwise fraudulent. Copies of the alleged fraudulent vouchers are also set forth. If, therefore, the so called "consolidated settlement" were inadmissible, as not being a full account, it was wholly immaterial, because the same facts would appear from an examination of the account between Howgate and the United States, both sides of which were contained in the other transcripts accompanying that consolidated settlement.

We think the certificate as to those transcripts was entirely sufficient, and the transcripts themselves were admissible as sufficient transcripts from the books and proceedings of the Treasury Department within section 886, Revised Statutes, and that the certificate which certified that the papers annexed to the transcript were true copies of the originals on file, and of the whole of such originals, was a full compliance with law. *United States* v. *Pinson*, 102 U. S. 548; *United States* v. *Bell*, 111 U. S. 477.

As to the objection that the transcripts show on their face that the accounts therein referred to had been restated since the acceptance of the resignation of Lieutenant Howgate, and that there was no authority to make such restatement, we think the objection untenable. As has been heretofore stated, there had been no actual and formal settlement between the Government and Howgate, and no admission made by the Government for the purpose of discharging him and his sureties

from liability on the bond. Howgate, for the purpose of obtaining payment of his own salary, had procured certain statements from various departments, acknowledging that by the books of those departments he did not appear indebted to the Government, and by virtue of those certificates he had obtained final payment of his salary, but subsequently to that time, when other facts became known, causing an investigation into the state of the accounts, it became apparent that Lieutenant Howgate, at the time when he obtained these certificates of non-indebtedness, was in truth a defaulter, and that he owed the Government over a hundred thousand dollars. After the final payment of his salary, when these facts became known, the Acting Chief Signal Officer made up a statement of the account between Howgate and the Government, which showed in detail the vouchers and checks which were known to be fraudulent, with the names of witnesses, etc., which statement was sent to the Secretary of War, together with a report of the officer making up the account showing the true state of the account. After that time, and in compliance with the request of the Solicitor of the Treasury, the Secretary of War sent to the Second Comptroller of the Treasury this statement of the account, together with a copy of the report of the Acting Chief Signal Officer which accompanied it, and the Secretary stated that the papers were forwarded to the Second Comptroller with a view to a restatement of the accounts of Howgate for use in the suit on his bond of April 2, 1878.

It therefore appears that this so called restatement of the account was no mere gratuitous and unsolicited work on the part of the clerks of the Treasury Department, but that the restatement was made substantially by direction of the Secretary of War, under the supervision of the Second Comptroller of the Treasury, and asked for by the solicitor of that department, and it was all done that from the books and proceedings of the Treasury Department a transcript might be made that would show the actual state of the accounts between the Government and Howgate after excluding these false and forged vouchers upon which he had obtained credit and by means of which he

was enabled to procure the certificates of non-indebtedness above referred to. The idea that under circumstances like these there would be no power in the officers of the Government to restate an account between the Government and an officer by disallowing credits given him upon false and forged vouchers cannot be entertained for a moment. The cases already referred to in this opinion dispose of such a claim.

(7). One other objection was taken upon the trial, and that was to the admission of the judgment recovered against Howgate by the Government.

Neither surety was a party to that judgment which was solely against Howgate, and the record in that case was admitted in evidence under the objection and exception of the defendants. We are of opinion that the judgment was properly admitted in evidence against the surety. It proved, at least, *prima facie* a breach of the bond by showing the amount of public moneys which Howgate the principal had failed to faithfully expend and honestly account for. It was far beyond the penalty in the bond, and, unexplained, the judgment was sufficient evidence of the breach of condition. *Drummond* v. *Executors of Prestman*, 12 Wheat. 515; *United States* v. *Allsbury*, 4 Wall. 186; *McLaughlin* v. *Bank of Potomac*, 7 How. 220; *Stovall* v. *Banks*, 10 Wall. 583; *Washington Ice Co.* v. *Webster*, 125 U. S. 426.

This completes the examination of the various questions which were argued at the bar by counsel for the defendants. Other questions have been raised in the briefs and have received our careful attention. We find nothing in the record which justifies a reversal of the judgment, and the same is, therefore,

*Affirmed.*