IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

## AT JUNE TERM, 1876.

---

## SOOY, IRICK, ET AL. ADS. THE STATE.

1. A voluntary bond given by the state treasurer for the faithful discharge of his duties, is valid.
2. Nor would such bond be deemed extorted, and therefore invalid, if the legislature required the giving of such bond under pain of refusing to permit such treasurer from continuing in office and of receiving the emoluments thereof; the treasurer being a constitutional officer, is not subject to the legislative will.
3. The doctrine of duress and extortion in relation to official bonds, considered.
4. The requirement of the statute that the treasurer's bond shall be approved of by the senate, is merely directory.
5. Nor does the provision that the dividends due upon stock owned by the state shall be drawn when necessary, on the draft of the comptroller, make such draft indispensable to a valid payment in all cases.
6. The legislature is the agent of the state in taking the treasurer's bond, and if fraudulent representation is made by it to the sureties which are operative in the execution of it by them, such bond is void.
7. Other questions of pleading discussed.

---

On demurrer to pleas.

Argued at February Term, 1876, before BEASLEY, CHIEF JUSTICE, and Justices WOODHULL, VAN SYCKEL, and SCUDDER.

For the state, *Vanatta*, Attorney-General.

For the defendants, *Ten Eyck* and *C. Parker.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. This is a suit on the bond of Josephus Sooy, given by him as treasurer of the state. The questions to be settled arise on a demurrer to several special pleas, the sufficiency of which will be considered in the order in which they appear upon the record. It should be premised that they are all put in by the sureties, and that Mr. Sooy does not join in these defences.

The second plea, and which is the first of those demurred to, states, in substance, that Josephus Sooy, Jr., was duly appointed treasurer on the 13th of February, 1873, and that he thereupon took an oath of office and gave a bond, according to law; that no other person was, after that time, and prior to the date of the bond in suit, appointed to said office; nor was he, the said Sooy, appointed anew to it, but that he, the said Sooy, by force of the constitution of the state, continued in said office from the said 13th of February, 1873, hitherto; that the legislature, or either branch of it, did not suspect the obligors in said treasurer's bond to be insufficient, or require, on that account, the said Sooy to give another bond; that said Sooy was not required by law to give any other bond than the one first given by him, but that, notwithstanding, that, on or about the date of the bond in suit, " the same was, by order of the two houses of the legislature, caused to be prepared and transmitted to said Josephus Sooy, Junior, and it was required and demanded of him that the said bond or writing obligatory, and the conditions therein written, should be executed by him, the said Josephus Sooy, Jr., with sufficient sureties, before he should be permitted to

remain in the said office of treasurer, or to receive the pay and emoluments attached thereto; and the said defendants say that the said bond in the penalty thereof is variant, and wholly different from what is required by the act of the legislature in such case made and provided," &c., and was exacted and extorted from the said Sooy and the defendants, his sureties.

It will be observed, from this sketch of the plea, that the situation leading to the legal issue now before the court is this: Mr. Sooy, on originally going into office, executed a bond which, as the then existing law required, was in a penalty of $50,000; that he was not re-appointed, but held over, and in the year 1874 he gave the bond in suit, which is for the payment of $300,000.

The defence rest in this plea, on the ground that, in such a juncture, there was, first, no law requiring the treasurer to give a second bond; and, second, that the bond in suit, being extorted from him by the legislature, is void.

A denial of the fact is the answer, made by the Attorney-General, to the first of these contentions and in support of such denial, and in proof of the existence of a law authorizing the taking of the bond in suit, we are referred to the supplement to the act respecting the office of treasurer, passed on the 27th of March, 1874. But it seems to me that the statute thus vouched is inapplicable to the posture of things when this bond in question was taken. Mr. Sooy had then long been in office, and was holding over, by force of the constitution of the state, until his successor should be appointed and qualified. The language of this supplement to which our attention was drawn, is: "That the treasurer of this state shall, prior to the entering on the duties of his office, take and subscribe an oath of office, and give bond with sufficient sureties, to be approved of by the legislature, in the sum of $300,000," &c. Than these terms it would be difficult to select any less fitted to describe duties to be imposed on an incumbent in office at the time of the passage of this act. The express requisition is, that the treasurer shall give bond " prior to the

entering upon the duties of his office." How can this relate to one who, more than a year before, had entered upon the duties of the office, and at that time had given a bond ? In construing laws, the court is bound by legal rules, and, in order to discover the legislative intent, we must look to the statutory language alone, in its application to its subject. We cannot go for such a purpose to the journals or debates of the legislature, nor to our own memory ; the statute must speak for itself, and we cannot add a syllable to what it speaks. When this act, therefore, declares, in plain words, that a treasurer shall, prior to entering on the duties of his office, give a bond and take an oath, we cannot say that such description embraces a treasurer who has already entered on the duties of his office, and has already given a bond and taken an oath. If the design was to embrace in the requirement a treasurer holding over his first year, by reason of the non-appointment of a successor, it would have been easy to have expressed such idea ; but, to the contrary of this, we have here language which will not bear, if it is treated with fairness, any such interpretation. Nor do I find anything to wonder at in this insufficiency in the scope of the terms used, when I call to mind that this act is, with the exception of the amount of the penalty of the bond, a copy of the first section of the act relating to the treasurer as it has existed since the days of Judge Paterson. It is very obvious that this original law was framed on the theory of an orderly conduct of the affairs of the state, and therefore, upon the assumption that a treasurer would be appointed regularly to office ; and hence it made no provision for an occasion which could arise only in consequence of the non-performance by the legislature of a duty enjoined upon it by the constitution. Accordingly, the statute being adjusted to constitutional conditions, exacted a bond and oath of treasurers prior to their entering into their office. It made no regulation for the abnormal case, which was not anticipated, of a treasurer remaining in office from the abdication of a legislative function. When, therefore, a law in its origin designed for such a purpose was re-enacted

in the year 1874, it is not at all surprising that by its clear terms it is found inappropriate to an emergency that was not in the contemplation of the original framers of it. This statute, I think, does not apply to a treasurer holding his office after the expiration of his official year, in consequence of the non-appointment of a successor.

Reaching then this point, that the law referred to is inapplicable, and that, consequently, there was no statute in force that required Mr. Sooy to give this bond; the next inquiry, in testing this plea is, whether this instrument is sustainable as the voluntary act of the obligor and his sureties.

There is abundant authority for the proposition that a bond, not exactible by law, but given without compulsion, by an officer, conditioned for a faithful discharge of his duty, is valid. In the case of *The People* v. *Collins*, 7 *Johns.* 554, it is said : " The general rule is that a bond, whether required or not by statute, is good at common law, if entered into voluntarily, and for a valuable consideration, and if not repugnant to the letter or policy of the law." The question has arisen and has been considered, and adjudged to a like effect in a number of cases in the United States courts. The leading example is that of *The United States* v. *Tingey*, 5 *Peters* 115, an authority which is likewise to be considered with respect to another aspect of this discussion. The inquiry was there directly presented whether a bond, which had been given by a disbursing officer and his sureties, to secure the faithful performance of his duties, constituted a valid contract, the fact being that the taking of such bond was not prescribed by any act of congress, and such inquiry was answered in the affirmative, the court saying, in the language of Judge Story's opinion, " we hold that a voluntary bond, taken by authority of the proper officers of the treasury department, to whom the disbursement of public moneys is entrusted, to secure the fidelity in official duties of a receiver or an agent for disbursery of public moneys, is a binding contract between him and his sureties and the United States, although such bond may not be prescribed or required by

any positive law." This view has been so often approved of in subsequent decisions, and has been so many times put in force, that, I think, the rule is to be considered entirely established, and that it is quite superfluous to cite the authorities in detail. Conceding, as has been done, that the law did not require Mr. Sooy to give the present bond, still, as it was given for a lawful purpose, and is entirely coincident with just public policy, it is clearly obligatory in law, if it was made without illegal coercion. Regarding it as an instrument voluntarily executed, I cannot see that it is, in any respect, open to objection. The question, consequently is, was this instrument executed, in a legal sense, freely or upon constraint?

The facts stated in the plea to show that the bond in suit was extorted, are substantially, that the two houses of the legislature "required and demanded" that it should be executed before the treasurer "should be permitted to remain in the said office of treasurer, or to receive the pay and emoluments attached thereto." Was this such an act of extortion that it will, in law, invalidate this obligation?

It seems to me that if we look only to legal principles as they are to be found in the common law, it will be manifest that no act of extortion that falls short of duress, will avoid a sealed instrument. What duress is has been plainly expressed in the decisions of the courts, and by the elementary writers. Sir William Blackstone divides it into two parts; *first*, duress of imprisonment, where a man actually loses his liberty; and *second, per minas,* of which four instances are enumerated by Lord Coke; 1st, fear of loss of life; 2d, of member; 3d, of mayhem; 4th, of imprisonment. To constitute the defence the imprisonment, threatened or inflicted, must be unlawful. *Aleyn* 92; *Bull., N. P.,* 172. It will not do if the threats are directed to the burning of houses or the destruction of goods. *Co. Litt.* 253, *b.* Baron Parke in *Atlee* v. *Backhouse,* 3 *M. & W.* 650, says: "The law is clear, although there is some case in Viner's Abridgment to the contrary; that in order to avoid a contract by reason of duress, it must

be duress of a man's person, not of his goods; and it is so laid down in *Shep. Touch.* 61." The only relaxation of the doctrine, if such it be, which I find indicated in any of the English books, are the two instances to which we were referred by counsel on the argument, mentioned by Lord Coke. 3 *Institutes, ch.* 69, *p.* 148. The former of these cases is, where a bond was executed by the king's council, or ministers of a subject, " to come to the king with force and arms, &c., when he should be sent for;" and Lord Coke says such bond was void. But as such invalidation was produced by force of the act of 1 *Edward III, Stat.* 2, *ca.* 15, which specially forbade the exaction of such bonds, the citation of this authority is, to the present purpose, irrelevant. The latter cf the two of the above mentioned cases, stated by this erudite writer is, that if a bond "not warrantable by law," is exacted by a bishop, or other ecclesiastical judge, in "any case ecclesiastical," such bond is likewise pronounced to be nugatory. But as a bond illegally taken from a suitor in the course of a suit pending, by force of a judicial mandate, would be obtained by a species of intimidation, closely akin to a threat of imprisonment; such an instance can scarcely be claimed as standing opposed to the doctrine that no extortion save duress will illegalize a contract at the common law.

But while I think it clear that such was the ancient rule of the law, and, although, this rule appears to be still adhered to by the English courts, it must be admitted that its stringency has, in some measure, been relaxed in this country. There are a number of decisions in the federal courts which seem to countenance the idea that a constraint not tantamount to duress will defeat a bond. These decisions embrace two classes of cases, which, in principle, are entirely distinct. The first of these consists of bonds professedly taken in pursuance of the requisitions of a statute, but which vary in substantial particulars, from the form or matter prescribed. In the early case of *Dixon* v. *The United States*, 1 *Brockenborough* 177, Chief Justice Marshall appeared to incline to the opinion, that where a statute empowered the taking of a bond, the gen-

eral policy of the law required that the statute should be pursued, and the power executed conformably to it. And in the case of *The United States* v. *Howell*, 4 *Wash. C. C. Rep.* 623, Mr. Justice Washington says that his opinion is, "that where a statute requires an official bond to be taken, and prescribes substantially the terms of it, it must conform to the requisitions of the statute, and if it go beyond them it is void, so far, at least, as it exceeds those requisitions." This doctrine that statutory obligations must conform strictly to the law by whose authority they are taken, and that if they contain super-additions they are so far forth, at all events, void, is exemplified in the following determinations : *United States* v. —— ——, 1 *Brock.* 195 ; *United States* v. *Morgan et al.*, 3 *Wash. C. C.* 10 ; *United States* v. *Brown, Gilpin* 155 ; *Armstrong* v. *United States, Peters C. C. R.* 46 ; *United States* v. *Bradley*, 10 *Peters* 343.

But with this line of cases we, at present, are not concerned; they are not in anywise applicable. The bond in suit was not a statutory bond ; it was taken without any color of authority from any existing law; the first step in this inquiry reached this point, which was considered to be clear, that the statute of 1874 did not look to the case of a treasurer continuing in office after the expiration of his year by reason of the non-appointment of his successor, and that such juncture was a *casus omissus*. It must, therefore, I think, be conceded that this principle running through the decisions just cited to the effect that in the taking of statutory bonds, if the act is not followed, the instrument taken will be, under some circumstances, invalid, can have no effect on the subject now under consideration.

But it is the other class of decisions in the federal courts, above referred to, which approach nearer to the matter in hand. These lay down the doctrine that even a voluntary bond may be void from being extorted by a compulsion falling short of duress. On this branch the leading case is that of *The United States* v. *Tingey*, reported in 5 *Peters* 115. This was an action on a purser's bond, and in its condition imposed

several very burdensome obligations on the principal obligor which were not prescribed by this statute, by force of which the right to exact a bond existed. The plea, which is the model of the plea now under examination, set up that the bond then in question had been prepared by the navy department and transmitted to the purser with a demand that it should be executed with sufficient sureties before he should be permitted to remain in the office of purser, or to receive the pay or emoluments attached thereto. These facts were thought to make out a legal defence to the suit, the plea on a demurrer to it being sustained. The grounds of this decision, as stated by the court, are, that the bond, containing conditions variant from those prescribed by law, was extorted by the secretary of the navy as the conditions of the purser's remaining in the office and receiving its emoluments. " It was plainly, then," says the opinion, " an illegal bond; for no officer of the government has a right, by color of his office, to require from any subordinate officer, as a condition of holding office, that he should execute a bond with a condition different from that prescribed by law. That would be not to execute, but to supersede the requisitions of law."

It is very manifest that if this decision was grounded alone in the fact that the bond was obtained by compulsion, it would be a wide departure from that doctrine of the common law already stated, which required such compulsion, in order to be legally effective, to amount to duress. The plea which was deemed sufficient exhibited no such force as could be said to destroy, upon legal principles, the free agency of the party giving the bond. But I think the result which was obtained was reached by the court in great part from the persuasion that where a statute directed a bond of a certain character to be given, the officer having the power to require it should not, on grounds of just policy, be permitted to demand a different and more onerous one. Even in this view it would seem that the case is open to much doubt, and can be vindicated, in my opinion, on the hypothesis only, that the act of the navy department in that instance, was to be considered

as inconsistent with the regulations established by the law for the government of that branch of the public service. The bond was not obtained by duress, or by any coercion having a likeness to it; but the prescriptions of the law, plain and definite in their character, had been violated by the superior officer, to the detriment and oppression of his subordinate. The case was one of first impression, and does not rest in anywise on authority. We are not called upon, on this occasion, to decide whether the rule of this decision shall be admitted into the jurisprudence of this state, for the facts of the present case are, in essential particulars, variant from those to which that adjudication relates. In the reported case there was a statute prescribing what kind of bond was legally demandable, and a consequent violation by a public officer of such statutory regulation; in the case now before us, there is nothing of the kind; there is no statute intended to control official action over the subject, and therefore this bond, is, in no sense, as I have before said, a statutory one.

But the principal feature in which the two cases differ, is in the absence from the present one of that element of illegality in the demand of the bond, which appears in the case decided in the federal court, and which element is always essential when either extortion or duress is set up. In *The United States* v. *Tingey*, the secretary of the navy, according to the pleadings, had claimed what he had no right to claim, and what he had no power to enforce, except by the exercise of arbitrary power. He demanded the bond in defiance of the statutory provision, under threat that he would keep the purser from the exercise of his office, and would withhold from him its emoluments. This was sheer usurpation of authority, and a tyrannous abuse of his official position. In this case, nothing of the kind can be reasonably alleged. It does not present the feature of a superior officer tyrannizing over an inferior. The state treasurer is a constitutional officer, and in his office is not subject to legislative rule. His office cannot be taken away from him until his term is ended, nor can he be deprived of its emoluments. The only point that

a legislative threat could have under the given circumstances was, that, unless the treasurer gave the bond demanded, a law would be passed compelling him to compliance, or that his successor would be appointed. But such a threat was not a menace that anything illegal would be done; the enactment of such a law, or the appointment of a new treasurer, were, both of them, warranted by the laws of the state. The threat, therefore, set forth in the plea, was either an idle threat, such as neither the law nor any sensible person would regard, or it meant that, in case of a refusal to give the bond called for, a legal course would be pursued. A demand made under the urgency of an intimation that, if not complied with, the law will be appealed to, cannot reasonably be claimed to be either extortion or duress. Such a threat, or one entirely impotent, does not, in legal contemplation, place the person against whom it is aimed, in *vinculis*, nor destroy, in any degree, his free agency. The consequence is, that the facts exhibited in this plea could not, in the nature of things, constitute illegal compulsion. A sufficient defence not appearing, the demurrer as to it must be sustained.

The next plea demurred to is the third on the record. The substance of it is, that the bond in suit was not executed before the president of the senate, nor was it approved of by the legislature.

The statute respecting the office of treasurer ordains that the treasurer shall " give bond, with sufficient sureties, to be approved of by the legislature."

The act with respect to this ceremony of approval is clearly directory, and its non-observance cannot affect the validity of the instrument. It is suggested in the brief of counsel that this legislative approval is an indispensable part of the acceptance of the obligation; if this be so, the result would be that the bond never had any existence, the delivery not being complete, and the defence would be appropriate under the plea of *non est factum*. But I do not think there is any substance even in this suggestion; the bond may be obligatory,

even if it has never been approved by the legislature. This plea cannot be sustained.

To the fourth plea, the objection is merely formal, the alleged fault being that it should have concluded to the country, and not with a verification. This criticism, I think, is just. . The declaration assigns as a breach, according to the language of the condition of the bond, that the treasurer did not account, &c., and did not well and truly perform the duties of his office. The plea meets this negative by an affirmative, alleging the performance of these matters in the words of the bond and the breach as alleged in the declaration. There is no new fact alleged in the plea, and, consequently, no place for a verification. The plea in this respect is clearly defective.

The sixth plea was not noticed on the argument, and it is presumed its insufficiency was intended to be conceded. Its gravamen consists in an alleged non-performance of a duty by the comptroller ; but it does not show any injury resulting from such omission ; it barely intimates the possibility that such was the case—it says if a certain state of facts exists, then a defence exists. Such pleading is clearly bad.

The seventh plea, it was admitted on the argument, would not, in its present form, present for decision the question intended to be raised. It is suggested in the brief that, while in the hands of the court, it may be considered as amended so as to give rise to the contemplated issue. But this suggestion I am not willing to put in force. The form and substance in pleading are so closely commingled that it requires care and skill to adapt the one to the other, that it might lead to dissatisfaction, if the court should undertake to make the proposed modification. The plea, as it stands, is good in substance, as it alleges that part of the moneys in question were the individual moneys of Mr. Sooy, and did not come to him as treasurer. Such an allegation, however, has no office in the case, and can have no effect ; and as it is associated with a statement of other facts, the plea should be

struck out on motion. It must, however, be sustained as against this demurrer.

The eighth plea sets up, that part of the moneys in controversy consisted of dividends on certain stocks owned by the state in certain corporations; and that by the law of the state the comptroller is required to draw in favor of the treasurer upon such corporations for such moneys; and that if such moneys were paid to Mr. Sooy, they were paid without such drawing by the comptroller, and were paid to him by said corporations in their own way.

It is obvious that this plea is founded on the idea that, under no possible circumstances, can the dividends of the stocks owned by the state come into the hands of its treasurer as a part of the public moneys, unless such moneys shall be drawn upon the draft of the comptroller. But I think this is obviously a misconception of the law. The statute does not make this form necessary in every case. The language is that the comptroller shall thus draw in favor of the treasurer " when necessary." Suppose the company should transmit to the treasurer the amount of the dividends, without waiting for the comptroller's draft, and the treasurer should give a receipt therefor, countersigned by the comptroller, can there be any doubt that even in form such a course would be strictly statutable. In such a case a draft would not be necessary, and the direction of the act is, that a draft shall be drawn, " when necessary." The naked allegation of this plea, therefore, that the money was not received on the draft of the comptroller does not show a legal defence. This plea cannot be sustained.

In the tenth, and last plea, fraud is the defence disclosed.

The averments, in effect, are—that for a year prior to the giving of the bond in controversy, Mr. Sooy had been treasurer, " and that during all that time he, the said Sooy, had been wanting in regularity in the performance of his duties as such treasurer, and in the keeping of his accounts as such, and had at various times embezzled and wasted divers sums of money of them, the said plaintiff, and applied the same to

his own use, and had borrowed from divers persons divers sums of money, in the name of the plaintiff, and as the said treasurer, but in reality for his own use, and had been a defaulter to the plaintiff, and in regard of the moneys in his hands as such treasurer, all which was known to the plaintiff and to the comptroller of the State of New Jersey for the time then being, and apparent upon the account books of the said treasurer, and thereby known to said comptroller, but of all and every of which these defendants, at the time of making and delivering said bond, was wholly ignorant." And these defendants say that, prior to the sealing and delivery of said bond, and on, &c., the defendants, being applied to and requested to become such securities, made inquiry of the said comptroller in regard to the integrity and business habits of said Josephus Sooy, Jr., and as to the manner in which he had fulfilled the duties of said office, &c.; but these defendants say, that, notwithstanding the premises, the said *legislature* and *the said comptroller* did not make known to these defendants, or either of them, their information and knowledge touching the integrity and business habits of said Josephus Sooy, Jr., as shown by him in his said office, nor any of the irregularities or defalcations aforesaid, but not only there made default, but averred and declared to said defendants, and each of them, prior to the making of said bond, and to induce them to execute the same, that said Josephus Sooy, Jr., was a man of integrity and good business habits, and had so shown himself in all things in the performance of his duties as such treasurer, whereupon these defendants relying, &c., executed the bond, &c.

In the argument touching the matters thus set forth, the principal position taken by the counsel of the defendants was, that in this plea concealment of material facts known to the state was shown, and which facts, if divulged, would have prevented this contract of suretyship, and that such concealment rendered the contract void. The cases illustrative of the duty of the obligee to make disclosure of facts within his

knowledge, which go to increase the risk of suretyship, were cited and pressed upon the attention of the court. The only other theme of debate related to the effect of the alleged misrepresentations of the comptroller. But the slightest examination of the case here made at once discloses the fact that these matters, thus argued, are mere adjuncts, immaterial to the substance of the defence. The gravamen of the plea is, that the bond in question was obtained, not by the failure to make the requisite disclosure of facts within the knowledge of the obligee, but by active deceit and express falsehood. Nor is it stated that such fraudulent act was that of the comptroller alone. The allegation is that the legislature, with knowledge that Mr. Sooy had, as treasurer, wasted and embezzled the moneys of the state, averred and declared to the defendants, in order to induce them to sign this obligation, that " said Sooy was a man of integrity and good business habits, and had so shown himself in all things in the performance of his duties as such treasurer." In the presence of such an allegation the questions as to the effect of concealment, and with respect to the legal power of the comptroller, became matters of no moment. They are mere concomitants of the principal fact above stated, and are inserted with so loose a texture that they cannot be separately considered. The legislature was unquestionably the agent of the state in the transaction embracing the reception of this bond, and if such agent, in the course of such business, perpetrated the fraud here alleged, there can be no question but that the instrument obtained by it is void. I am strongly inclined to the opinion that the true rule of law is laid down in the case of *Lee* v. *Munroe*, 7 *Cranch* 366, in which it is said that the government is not bound by the declarations of its agent, unless it clearly appear that the agent was acting strictly within the scope of his authority. I do not think that gratuitous information given by a public officer, or his acts or assertions, when not made in the discharge of his duty, can, in anywise, affect the legal rights of the state.

But the facts in this plea place the defence within the compass of the rule thus defined, and, consequently, a good defence to the action is here disclosed.

The demurrer being general to all these pleas, must be overruled.