ORDINARY OF STATE OF NEW JERSEY
v. UNITED STATES FIDELITY & GUAR-
ANTY CO. OF BALTIMORE, MD.

No. 8687.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 15, 1945.

Decided April 26, 1945.

As Amended June 13, 1945.

W. Horace Hepburn, of Philadelphia, Pa. (James Mercer Davis, of Camden, N. J., on the brief), for appellant.

Walter R. Carroll, of Camden, N. J., and Arthur C. Holmes, of Baltimore, Md. (Carroll & Taylor, of Camden, N. J., on the brief), for appellee.

Before BIGGS, McALLISTER, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is the second time this case has been before us. Originally it had been tried by a district judge, sitting without a jury, who found in favor of the defendant. We reversed the judgment because there were no findings of fact by the court below. We remanded the cause so that the District Court might make such findings of fact and conclusions of law, 3 Cir., 136 F.2d 536. The judge who had tried the case died before he had the opportunity to attend to this. Thereafter, another district judge, under the heavy handicap of not having heard the matter, after reviewing the record and hearing arguments of counsel, found facts and conclusions of law and decided in favor of the defendant. It is from the second judgment that plaintiff appeals.

The evidence shows that on May 7, 1930, James D. Halton died, a resident of Lakewood, Ocean County, New Jersey. Toms River is the county seat of Ocean County. On August 21, 1930 a caveat was filed against the probate of Mr. Halton's will. A petition asking for the appointment of an administrator pendente lite was presented to the Ocean County Orphans' Court. This set out that the deceased had owned approximately $150,000 in negotiable securities and unregistered bonds, and a considerable amount of stock and other assets. Toms River Trust Company was appointed administrator pendente lite with its bond fixed at the sum of $125,000. Such bond, dated August 19, 1930, with Lloyds Casualty Company as surety, was approved by the court and filed with the surrogate. Frank W. Todd of Toms River, was the agent for Lloyds Casualty and he executed the bond as attorney in fact for that concern. On September 10, 1930, Toms River Trust Company was appointed ancillary administrator pendente lite in the same estate by the Register of Wills of Philadelphia County, Philadelphia, Pennsylvania. The bond filed there was for $200,000, with National Surety Company as surety. The Board of Directors of Toms River Trust Company thereafter passed a resolution which does not appear in any of the appendices. Concerning this, the trial judge said in his opinion that, by virtue of it, Anthony M. Then, President of Toms River Trust Company, on September 12, 1930 removed from a safe deposit box in the Girard Trust Company in Philadelphia, securities valued at about $140,000. Then brought these to Toms River Trust Company. On March 31, 1931, Todd also became agent and attorney in fact for the United States Fidelity & Guaranty Company. On July 21, 1931, Toms River Trust Company filed an inventory and appraisement in Ocean County of the property of the Halton estate. This included $8500 worth of real estate and the assets which had been taken from Pennsylvania. The total value of the estate was placed at $171,258.35. At the period of the expiration of the Lloyds' bond in August 1931, another bond in the Halton estate to the Ordinary of the State of New Jersey and in the sum of $125,000 was executed by the Toms River Trust Company, as administrator pendente lite, with the United States Fidelity & Guaranty as surety. This bond is dated August 19, 1930. It was executed for the bonding company by Todd as attorney in fact. It is a printed bond, the back of which reads:

"Ocean County Surrogate's Court
"In the Matter of the
Estate of
..................
deceased
"Bond
"Administrator with Will Annexed
"Filed
"Recorded
"Surrogate"

An application is attached to the bond. Questions and answers of this numbered 5, 6, 12 and 16 are pertinent and read:

"5. Nature of bond. Administrator CTA Penalty $125,000."

"6. Court in which filed. Ocean County Orphans' Court Toms River"

"12. Please list briefly the property, real and personal, covered by this bond

| | |
|---|---|
| Real Estate | $8,500 |
| Personal | $171,000 |

"There is $200,000 personal in Pennsylvania which the National Surety Bond covers"

"16. On what date were you appointed to this trust August 19, 1930 Will this be the first and only bond you will have given in the matter no If not, who are now surety for you, and why is it desired that our bond be substituted therefor National Surety Co. $200,000 Penna."

Following the application and also attached to the bond, is an agreement, whereby among other things, Toms River Trust Company, by Then ¿he president, agreed to pay to the company for the bond, a premium of $350 in advance for the first year and $333.33 in advance for each year thereafter. There was also a separate application to which was attached a similar agreement. These were filled out in the same manner as those attached to the bond.

Todd was called as a witness on behalf of the plaintiff. On direct examination he testified that: After the bond was executed by the trust company and by him for the United States Fidelity & Guaranty Company, he delivered it to the surrogate's office. He does not recall who was in the office at that time. After that, it is his recollection that he spoke to the judge in charge of the matter. Two or three months later he said he went to the surrogate's office and asked for the bond. He did this because he "heard some rumors in connection with the Toms River Trust Company." "There was some trouble." The trust company was taken over by the New Jersey Commissioner of Banking and Insurance on October 15, 1931. The bill of United States Fidelity & Guaranty Company for the bond was marked in evidence and used in questioning Todd, who said that his office had sixty days in which to pay it. Asked why he entered into the bond he said, "Because I wanted to substitute this for another bond." Regarding the prior bond, he said, "I thought I picked it up." With his memory refreshed by reading a statement (approved by him in November 1936) regarding his regaining possession of the United States Fidelity & Guaranty bond he said, "As I recall I got [it] from Clinton O. Fogg, who was at that time the Surrogate." Questioned as to how he got it, he answered, "I asked for it." and that was his best recollection. He then stated that he delivered the bond to the United States Fidelity & Guaranty office in Philadelphia. On cross examination he testified that the United States Fidelity & Guaranty bond was his own idea. He was asked about a statement dated April 1, 1938 and signed by him, which said that he had placed the United States Fidelity & Guaranty bond among the Halton estate papers in the surrogate's office. Todd said this was a mistake. Todd continued with the United States Fidelity & Guaranty as its attorney in fact until June 1936.

█ Snyder, an investigator of the National Surety Company, testified that he examined the Halton file in the surrogate's office on October 28, 1931 and found both the United States Fidelity & Guaranty and Lloyds bonds in it. As to the United States Fidelity & Guaranty bond he said that "Since there was no entry in the docket, or there was no order for the bond I inquired of Mr. Grover (then deputy surrogate, now surrogate) and he told me that there had been some discussion the previous summer about an additional bond, but there was no order entered for it." Grover, testifying, did not recall "* * * any conversation I ever had with Mr. Snyder." Specifically, he denied telling him that the court had stated it was not satisfied with the surety in this case and owing to the fact that there had been assets transported from Philadelphia to Toms River an additional bond was filed.[1] Grover had been a United States Fidelity & Guaranty agent ten or fifteen years ago. An investigator for Lloyds Casualty also saw both bonds in the surrogate's office October 28, 1931.

An order to show cause by the Orphans' Court in the Halton estate, dated October 31, 1931, was admitted in evidence. It ordered Toms River Trust Company, through the New Jersey Commissioner of Banking and Insurance, Lloyds Casualty Company and United States Fidelity & Guaranty Company, administrator pendente lite, to show cause why an account of the administrator pendente lite should not be filed and the estate assets turned over to such person as might be appointed by the court. It ordered service on the United States Fidelity & Guaranty Company and on the Toms River Trust Company by serving the New Jersey Commissioner of Banking and Insurance at Trenton, New Jersey. Affi-

---

[1] The trial court correctly ruled that Snyder's testimony, of what Grover allegedly told him, was received solely for the purpose of affecting Grover's credibility.

davit of proof of service of the rule to show cause upon the United States Fidelity & Guaranty Company and the Toms River Trust Company by service on the banking commissioner was produced at the trial by the surrogate and received in evidence. An account thereafter was filed in the Halton estate but whether as a result of the rule to show cause does not clearly appear. Eventually the Toms River Trust Company was surcharged as administrator pendente lite in the sum of $76,272.55 against which there was a credit of $11,440.88 leaving a balance of $64,831.67 for which this action was instituted. A vice president of the United States Fidelity & Guaranty Company, testifying for the defendants, identified the United States Fidelity & Guaranty bond as having been in his custody since receiving it from the United States Fidelity & Guaranty Philadelphia office. He said as to the charge. for the bond: "Charges are never cancelled. As a matter of fact, it was unpaid. It was never paid. In the normal course of business these items are charged automatically. As to whether or not they are paid is another question." He said the bond was cancelled flat and the charge removed. He said, regarding the order to show cause: "To the best of my knowledge this order did not come to the Home Office."[2, 3]

[2] The trial court, in its opinion, said with reference to the facts:

"The defendant's bond was never submitted to the court for approval, and, although it was originally filed with the papers of the Halton estate, it bore no filing mark. The bond was left at the Surrogate's office by Mr. Todd and placed with the papers in August 1931, and Mr. Todd in some way removed the bond from the file in the Surrogate's office the latter part of October 1931. I cannot determine from the evidence how it got in the file; who put it there; the manner in which it got out of the office, except that in both instances Mr. Todd was the moving party—he took it to the Surrogate's office and he took it away."

As to the law, the trial court said:

"I have examined the cases submitted, the principal one of which is State v. Sooy, 38 N.J.L. 324, and in all of these cases a voluntary bond (so-called) has been held valid and enforceable. In each of these cases, however, some record, demand, or request of some character is the basis for the execution and delivery of the obligation."

*     *     *     *     *     *

"In the instant case there was no demand. It does not appear that any one enjoyed any benefits under the bond so filed. So far as the record showed at the time there was no reason for its execution. It was never regularly filed or delivered. Of course, it was not paid for by the principal, but, to me, that is not important.

"I have searched the cases, have read them with care, and also have deliberated the situation to the best of my ability. I cannot apply to the bond in the instant case the voluntary character set out in the cases heretofore decided. The proofs do not justify such a conclusion."

[3] As stated, after the first judgment had been reversed the trial judge died prior to making findings of fact and conclusions of law as directed. The judge to whom the matter was then referred, from the record, found the following facts among others: That the application and bond were prepared by Todd at his own instigation and not at the request of the Toms River Trust Company or the United States Fidelity & Guaranty Company; that Todd placed the United States Fidelity & Guaranty bond among the Halton Estate papers on file in the office of the surrogate of Ocean County sometime in August 1931; that the bond was removed by Todd from that file in the latter part of October 1931; that the bond was not docketed or filed in the surrogate's office; and that there was no evidence to show that the order to show cause was legally served upon the United States Fidelity & Guaranty Company.

The court also found the following conclusions of law, among others: That there was no statutory or legal requirements necessitating the execution and filing of the United States Fidelity & Guaranty bond; that the Surrogate did not accept delivery of the bond; that the bond was not filed with the Surrogate or his office; that the bond was not delivered to and accepted by the obligee; that the bond had no legal existence; that no action was ever taken on the bond; that no one relied on the bond as it existed; that no one enjoyed the benefits of the bond as it existed; that the bond was placed by Todd in the file of the Surrogate of Ocean County without lawful authority or justification and without the knowledge and consent of the obligee or his lawful representative or representatives; that the defendant did not incur any liability on the bond; that it was not proved that the bond in suit was accepted by or on behalf of the obligee, or that the Orphans' Court of

Section 3:8–5, New Jersey Statutes Annotated provides the only special mention of administrator pendente lite bonds, it reads:

"In case of the grant of letters of administration, * * *; pendente lite, * * * and other grants of administration, the conditions of the fiduciary's bond shall be substantially as provided in section 3:8–4 of this title with such changes as shall be appropriate in view of the nature of the respective grants."

3:8–4, N.J.S.A. sets out conditions of bond on grant of intestate administration.

3:8–1, N.J.S.A. is the general section on bonds of fiduciaries. It is the section with which we are most concerned. The first paragraph of this reads:

"The ordinary, orphans' court or surrogate appointing a fiduciary in any of the instances enumerated below shall secure faithful performance of the duties of his office by requiring the fiduciary thereby authorized to act to furnish bond to the ordinary in such a sum and with such proper conditions and sureties, having due regard to the value of the estate in his charge and the extent of his authority, as the court shall approve."

■■ From this and under the present facts concededly there was no statute in force requiring the United States Fidelity & Guaranty bond. The one important question therefore is whether it is sustainable as a voluntary bond. By a long line of decisions commencing with Inhabitants of Woolwich Tp. v. Forrest, 2 N.J.L. 115, New Jersey subscribes to the voluntary bond doctrine. This being a diversity suit, that law is controlling, though as it happens the Federal cases are to the same effect.[4] In Koch v. Costello, 93 N.J.L. 367 at page 374, 108 A. 225, 228, the New Jersey Court of Errors and Appeals said:

"Now, the bond sued upon not having been a proper one, the recovery had thereon is, nevertheless, sustainable as on a voluntary bond. In Emanuel v. McNeil, 87 N.J.L. 499, 94 A. 616, we held that where there was no coercion or duress and the bond sued on, not being prohibited by statute, and not being contrary to public policy, but being founded upon a good and sufficient consideration, and intended to subserve a good and lawful purpose, is, between the parties, good as a voluntary bond. The bond sued on here was not the product of coercion or duress, was not prohibited by statute in the circumstances of this case, and would have been according to the statute if the proper situation had existed, was not contrary to public policy, and is founded upon a good and sufficient consideration and intended to subserve a lawful purpose, namely, to secure the release from imprisonment of the principal obligor; and it is, therefore, between the parties, good as a voluntary bond."

The appellee while recognizing the principle, insists that it does not apply because there was no offer and acceptance; no meeting of the minds; no consideration; that the bond served no purpose and was not required by law or any order of the court.

The instrument with its attached application and agreement was plainly intended as a bond in the Ocean County Orphans' Court Halton Estate matter. It was correctly drawn and embraced the statutory conditions for such obligation. It was properly executed by both the surety and the bank under seal.[5] The United States Fidelity & Guaranty Company handled the issuance of the bond as an ordinary business transaction. It raised no question at the time as to the lack of any court proceedings requiring it or approving it, or otherwise. It was delivered to the surrogate's office by the surety's representative. It was still there apparently on October 31, 1931,

---

Ocean County acquiesced in its filing by reason of the order to show cause signed by the court on October 1, 1931; and that judgment should be entered in favor of the defendant.

[4] United States v. Tingey, 5 Pet. 115, 8 L.Ed. 66; Moses v. United States, 166 U.S. 571, 17 S.Ct. 682, 41 L.Ed. 1119; United States v. Fidelity & Deposit Co., of Maryland, 9 Cir., 80 F.2d 26.

[5] A copy of Todd's power of attorney is attached to the bond and is in evidence. The original apparently was filed with the New Jersey Commissioner of Banking and Insurance. Todd retained such power until June 1936. By it, the company authorized Todd "To sign its name as surety to, and to execute, seal and acknowledge any and all bonds, * * *" in accordance with a resolution of the Board of Directors. That in turn gave him, among other things, the power of—"executing or guaranteeing bonds and undertakings, required or *permitted in all actions or proceedings or by law allowed* * * *". (Emphasis supplied.)

when the order to show cause naming United States Fidelity & Guaranty Company as a party was issued. Its presence in the file is the only reason in the record for including that company in the order. From the testimony, the surrogate had to know of its existence in his file for he gave it back to Todd. Though Fogg, the surrogate in 1931, was "very much alive" at the time of trial, he was not called as a witness or his absence explained. The order to show cause is some evidence of the court's knowledge and approval of the bond. The lack of affirmative proof that the company was notified forthwith by the banking commissioner of service on the latter for the company of a copy of the petition and order to show cause and of the mailing of those papers to the company, in no way detracts from this.[6] In addition to the unconditional delivery of the bond and its remaining in the custody of the surrogate, the presence of the Ordinary as plaintiff in this litigation indicates that he considers the bond an outstanding obligation in accordance with its terms.

While we have not been referred to a New Jersey decision on all fours with the instant situation, or have we found any by independent research, the cases of that state strongly support the document under consideration as a valid voluntary bond. There is no occasion therefore for reliance on authorities from other jurisdictions.

In Bloomfield v. Ash, 4 N.J.L. 314, an appeal had been taken from the decision of the Orphans' Court in a will case. Though the Orphans' Court thereby lost jurisdiction of the matter, it appointed an administrator pendente lite "upon condition that he give bond, etc.", which latter was furnished. On an action of debt on the bond, the obligors defended on the ground that the bond was void. Chief Justice Kirkpatrick for the Supreme Court held that the Orphans' Court had mistaken and exceeded its powers but nevertheless enforced the bond as voluntary, saying page 315:

"But the consequence drawn from that mistake, does not seem to me to follow. The defendant, Ash, upon the appeal being made as to the granting of general letters, sues for the administration pendente lite, and, the court being led into error by an imposition of his own, such administration is granted to him, upon condition that he give bond, &c., and thereupon he, with his sureties, enter into this bond. Having by this means possessed himself of the intestate's estate, under colour of law, he would now, in this manner, discharge himself of his accountability. It cannot be. The bond is voluntary and for a lawful consideration. The very attempt to get rid of it is contrary to all good faith."

In Ordinary v. Heishon, 42 N.J.L. 15, the guardian's bond did not comply with the statute in that it was for the estates of two infants whereas the law required a separate bond for the estate of each minor. Chief Justice Beasley in sustaining the bond as voluntary said at pages 17 and 18 of 42 N.J.L.:

"The act of tendering such a bond as this, as the security called for by the statute, was an act of great carelessness on the part of the guardian and his sureties, and *the acceptance of such instrument by the surrogate or the court, was conduct still more censurable; but it would seem*

---

[6] With respect to there being no evidence that the order to show cause was legally served on the United States Fidelity & Guaranty Company, the order provided that it be served on that company by serving the banking and insurance commissioner of New Jersey. The surrogate produced an affidavit of such service. The power of attorney of United States Fidelity & Guaranty Company to the New Jersey Commissioner of Banking and Insurance is an exhibit in the case. It was filed May 5, 1918 and remains in force. It makes the commissioner the company's attorney for the service of all original process and the company "stipulates and agrees that any original process against it which is served upon said attorney shall be of the same legal force and validity as if served

upon said United States Fidelity & Guaranty Company." The statute states that the banking and insurance commissioner give notice of such service forthwith to the insurance company and forward the papers by registered mail within two days of service upon him. There is no proof that these things were done. The attorney for the plaintiff seems to have been unable to locate the records of the New Jersey Banking and Insurance Commissioner with regard to Toms River Trust Company and so advised the court. The only other evidence with reference to service was an official of the defendant company testifying that to the best of his knowledge the copy of the petition and order had not come to the home office.

*to be irrational in the extreme, to conclude that, by reason of such improprieties, these sureties are to be absolved from all responsibility, and these innocent minors be left without redress. We have not adopted, in this state, the doctrine that, because a bond of this class does not conform to the statutory definition that it becomes, for that reason alone, unenforceable. In such a condition of things, the strong leaning of the courts has been to hold such instruments valid, to the full extent of their terms, so far as they embody the statutory policy, as voluntary obligations.* Inhabitants of Woolwich [Tp.] v. Forrest [1 Penn. 115, 2 N.J.L. 115]; Hoboken v. Harrison, 1 Vroom 73 [30 N.J.L. 73]; State v. Sooy 9 Vroom 324 [38 N.J.L. 324]. Consequently, the bond on which the action rests, is to be treated as valid, and is to be enforced according to the legal effect of its stipulations." (Emphasis supplied.)

In State v. Sooy, 38 N.J.L. 324, affirmed Sooy v. State, 41 N.J.L. 394, the state treasurer when he assumed office gave bond under the then existing law in the sum of $50,000. He held over beyond his term and during that period a supplement to the particular statute became effective. This read: "That the treasurer of this state shall, prior to the entering on the duties of his office, take and subscribe an oath of office, and give bond with sufficient sureties, to be approved of by the legislature, in the sum of $300,000." The treasurer then filed an additional bond in that amount. The court held at page 329 of 38 N.J.L.:

"Conceding, as has been done, that the law did not require Mr. Sooy to give the present bond, still, as it was given for a lawful purpose, and is entirely coincident with just public policy, it is clearly obligatory in law, if it was made without illegal coercion. Regarding it as an instrument voluntarily executed, I cannot see that it is, in any respect, open to objection."

Regarding the language of the statute "give bond, with sufficient sureties, *to be approved of by the legislature*" (emphasis supplied), the court said 38 N.J.L. at page 334:

"The act with respect to this ceremony of approval is clearly directory, and its non-observance cannot affect the validity of the instrument. It is suggested in the brief of counsel that this legislative approval is an indispensable part of the acceptance of the obligation; if this be so, the result would be that the bond never had any existence,

the delivery not being complete and the defence would be appropriate under the plea of non est factum. But I do not think there is any substance even in this suggestion; the bond may be obligatory, even if it has never been approved by the legislature. This plea cannot be sustained."

In Summit v. Coletta, 81 N.J.L. 153, 78 A. 1047, on appeal from a police court conviction, the defendant posted an appeal bond with surety. Later the surety surrendered the defendant. A new bond was thereafter filed. The appeal not being prosecuted nor the fine paid, the town brought suit on the second bond. The defenses were: That the acceptance of the first bond exhausted the police justice's power and deprived him of the authority to accept another bond; that there was no right in the first surety to surrender the defendant in discharge of his bond; and that the bond was without consideration, there being no statutory authority for it. The Supreme Court said at pages 155 and 156 of 81 N.J. L., at page 1047 of 78 A.:

"The bond recited the judgment and appeal, and was conditioned for its prosecution. * * * The rule is that both obligor and surety on a bond are estopped to deny, for the purpose of avoiding liability thereon, any recited fact therein.

\*  \*  \*  \*  \*

"It was not given for an illegal purpose. It complies substantially with *the statute. It was voluntarily entered into, and must be held binding although the proceedings anterior to its execution may have been irregular.*" (Emphasis supplied.)

Ordinary v. Cooley, 30 N.J.L. 179, involved an administrator's bond "entirely variant from the form prescribed" by statute. The court said 30 N.J.L. at page 181:

*"It is certainly true that the bond altogether varies from the form prescribed; nevertheless it appears, by the record, to have been voluntarily given, and is not made void by statute.* Such bonds have been uniformly held good in this court when they require nothing more than the law requires. Woolwich Tp. v. Forrest [1] Penn. 115 [2 N.J.L. 115]; Mayor, etc. of Hoboken v. Harrison and others, ante [30 N.J.L.] 73." (Emphasis supplied.)

In Ordinary v. Thatcher, 41 N.J.L. 403, 32 Am.Rep. 225, the order of the Orphans' Court sanctioned a bond by three named sureties. It was executed by two of them who delivered it to the Surrogate. In a

suit on the bond the defense was that it had been delivered in escrow. The court holding the defense invalid, said at page 406 of 41 N.J.L., 32 Am.Rep. 225:

"It is thus evident that unless the tradition of these bonds to the county surrogate be a tradition in law to the surrogate-general, they are not, in point of fact, passed to him at all. It seems to me, therefore, that the county surrogate is, in this matter, the representative of his superior officer, and that therein his entire function consists in a right to accept a delivery of the bond. He has no authority to do more than this; he is not empowered to make any terms, or to assent to any conditions, in behalf of his principal; and being a public officer, the extent of his ability is known to all persons dealing with him. The receipt of the bond on the part of the surrogate is a mere ministerial act, and in doing it he is the deputy of the Ordinary. It is, too, an official act, and, being a public officer, he cannot in such a transaction be the agent of an individual. In short, in my judgment, the surrogate-general receives this bond from these obligors by the hand of his subordinate, and, in point of law, the transaction consists of a delivery of the instrument to the obligee."

As to the order specifying three named sureties the court also said at pages 417, 418 of 41 N.J.L., 32 Am.Rep. 225:

"With respect also to the fact adverted to by counsel, that this bond was executed in view of the order of the Orphans' Court sanctioning a bond by three named sureties, it does not appear to me to be a circumstance having any legal force. The court certainly, by reason of such direction, was not precluded from changing its purpose, or from accepting a bond signed by a lesser number of sureties; nor could the existence of such original order qualify in any measure the act of these defendants in making delivery of this instrument; such order, as part of the transaction, may indeed tend to show what they expected would be done, but it does not help to explain what in point of fact they themselves did."

■ Under the Thatcher opinion, the surrogate here had no right to return the bond. His action in receiving it, as in the Heishon case, supra, was irregular but once he accepted delivery, the matter passed out of his hands. Through him the Ordinary had received the bond. Anything further in connection with it was for the court controlling the estate and for the Ordinary as obligee. Having taken the bond and placed it in his official Halton estate file, the surrogate had no authority to thereafter do anything with it but retain it until he was properly directed as to any further proceedings regarding it. True it was not marked "filed" or "recorded" but it was physically present in the particular Halton estate file for over two months after having been received by the "Surrogate's office."

■ On the question of consideration: The bond was under seal but entirely aside from that, in accordance with its attached premium agreement, the company duly billed the bank for the premium. This was not paid, solely because the company later decided to cancel the bond. The premium charge however, according to the company executive, was not cancelled but removed from the books. Whether or not the court would have allowed the charge in the estate account, the bank would still have been personally liable for it under its agreement. As to the thought that there was no other consideration involved, suffice to say that under the facts, the additional protection afforded by the bond was vitally important to both the trust company administrator and to the beneficiaries of the estate.

■ The appellee on its argument that the bond served no purpose, was not necessary, and would not have been required under the New Jersey law, first assumes that the Lloyds' bond was based on all the assets of the estate and that therefore the additional $140,000 worth of securities from Pennsylvania did not increase the quantum of the estate in New Jersey as far as any necessity for an additional bond is concerned. The original petition for administration gave the estate assets as approximately $150,000 in negotiable securities and unregistered bonds and a considerable amount of stock and other assets. The total of the July 1931 appraisement was $171,258.35. On these figures the assumption seems unjustified; but if true, then there was ample reason for a substantial increase in the New Jersey bond. Appellee then says, that since there was a bond in Pennsylvania for the assets in that state, no question of additional security in New Jersey could have arisen because of the transfer of the Pennsylvania stocks until this had been lawfully accomplished, which latter never happened. In support of this, Lewis v. Grognard, 17 N.J.Eq. 425 is cited. That case held that where there was estate

property in both New Jersey and Pennsylvania, the New Jersey administrator need not file an inventory or give bond for the property which was in Pennsylvania. There, the Ordinary said at page 427 of 17 N.J.Eq.: "Each administrator accounts for the property in his hands, before the tribunals of the state or sovereignty from which his authority emanates." The Ordinary in reversing the decree of the Orphans' Court said it was "founded upon the erroneous idea that the distribution of the fund can be legitimately made only in the place of the intestate's domicil." The decision, while not contemplating the extraordinary situation which confronts us, does not conflict with the support given the validity of the United States Fidelity & Guaranty bond by the fact that the administrator in New Jersey had $140,000 worth of additional assets which it had wrongfully taken from Pennsylvania and had thereafter listed in its New Jersey inventory and appraisement.

■ Finally, appellee asserts that the record is barren of proof that Todd's motive was to provide additional security because of the transfer of the assets from Philadelphia. Assuming his motive to be of any importance, there is substantial support in the case, that it was to furnish an additional bond. The application for the bond in suit does point to some connection with the Pennsylvania assets; it does give $171,000 as the valuation of the property of the estate and does not make the slightest reference to the Lloyds' bond. Todd did, as already pointed out, say that he intended to substitute the United States Fidelity & Guaranty bond for that of Lloyds but his actions belie that statement.[7] He at least had knowledge of the references to the Pennsylvania assets, the Pennsylvania bond and the estate valuation, in the application for the United States Fidelity & Guaranty bond. He delivered the bond to the surrogate's office but made no effort to obtain the Lloyds' bond. The Lloyds' bond had been filed and recorded under order of the court and had been marked "filed" by the judge himself. It is most unlikely that Todd would have removed it from the surrogate's file. Todd also was apparently quite content to allow the United States Fidelity & Guaranty bond to remain with the surrogate until after the

Toms River Trust Company had been taken over by the New Jersey Banking Department and he heard rumors of some trouble there. Only then did he do anything about regaining possession of it. Less than a month prior to the bond being delivered to the surrogate, the trust company had filed an inventory and appraisement of the property of the Halton estate, including the assets removed from Pennsylvania, which showed a total value of $171,258.35. The circumstances that the date of the United States Fidelity & Guaranty bond coincides with the renewal date of the Lloyds' bond and that they are in the same amount, are suspicious. But it must be remembered that it was the attorney in fact for the United States Fidelity & Guaranty Company, who was the moving party in this strange affair and who performed the very acts of which that company now complains.

■ We think the clear weight of the evidence shows the bond valid and enforceable as voluntary. While we have no doubt as to this, even if we had, then as said in the Thatcher opinion, supra, "* * * such doubt should be resolved in favor of the innocent person, to secure whom the bond was given, rather than to the advantage of these defendants, whose carelessness has at all events produced the situation." In the view we take of the matter it is not necessary to discuss whether the appellee is precluded from setting up the defense of invalidity because of the decree surcharging the estate.

■ The New Jersey statute with reference to prosecution of bonds of fiduciaries by the Ordinary as interpreted by the cases of that state would control the judgment in favor of the plaintiff which is here indicated. N.J.S.A. 3:8–20; Borden v. Wolf Silk Co., 108 N.J.Eq. 438 at page 445, 155 A. 623; Lee's Case, 43 N.J.Eq. 172 at page 175, 11 A. 125. Those decisions clearly point out that such judgment must be for the penalty of the bond. The same law provides for proceedings thereafter before the Ordinary to assess the damages. The order of October 30, 1940, by the Ordinary in the New Jersey Prerogative Court in the Halton Estate Matter which permits the present suit to be brought follows the statute and states that "the moneys recovered in such action, if any, be paid into this Court, to be applied

---

7 Appellant states he was forced to call Todd as a witness because the acceptance and filing of the bond were disputed but Todd is not shown to be actually hostile to the plaintiff.

toward making good the damages sustained by the non-performance of the conditions of said bond in such manner as this Court shall, by its decree, direct."

The judgment of the District Court is reversed and the cause remanded with directions that judgment be entered in favor of the plaintiff in the amount of the penalty of the bond, namely, $125,000, with costs.